JAMES S. WESTBROOK *vs.* THE TIMES-STAR
COMPANY ET ALS.

MALTBIE, C. J., HINMAN, BANKS, AVERY and BROWN, Js.

Argued January 6th—decided March 4th, 1937.

*Thomas D. Gill,* with whom was *Benedict M. Holden,* and, on the brief, *William A. Redden* and *Morton Weiss,* for the appellant (plaintiff).

*William H. Comley,* with whom was *Samuel Reich,* and, on the brief, *Philip Reich,* for the appellees (defendants).

AVERY, J. The plaintiff brought this action to recover for services as a broker claimed to have been rendered in negotiations to bring about a merger between the owners of the Times-Star, on the one hand, and the Post and Telegram, on the other, newspapers

published in Bridgeport. The suit was originally commenced against the Times-Star Company, a corporation which owned and published the Times-Star. Later, Henry D. Bradley, Harry S. Talmadge, Summer S. Simpson and Mortimer F. Judd, stockholders in the company were made codefendants. The claim of the plaintiff was that he undertook for the defendants, as a broker, to produce a purchaser of the Times-Star; that he produced such a purchaser in the Post Publishing Company, a corporation which published the Post and the Telegram, upon the terms and conditions which the defendants had stipulated; and that he thereby was entitled to his commission although no actual sale or merger was in fact effected. The trial court, however, concluded that although he undertook negotiations, they failed because of his inability to bring the parties to an agreement upon a completed plan covering the situation and mutually satisfactory, and that, therefore, no commission had been earned by the plaintiff from any of the defendants. This basic conclusion of the trial court is supported by the finding, and in his appeal the plaintiff has sought numerous corrections of and additions to the finding, claiming that if it were corrected as asked by him, the facts would establish liability not only upon the individual defendants but upon the corporation as well upon claimed principles of the law of agency. Unless, however, the plaintiff is entitled to a correction of the finding, no question of law is involved.

The evidence has been certified and supports the facts found by the trial court which may be summarized as follows: In June, 1934, and during the next two months thereafter, the Times-Star Company, a Connecticut corporation, had 2000 shares of preferred stock, of which Summer S. Simpson owned 1650, Sarah F. Judd 100, Harry S. Talmadge 200, and Ray

W. Talmadge 50. It also had 4950 shares of common stock, of which Harry S. Talmadge owned 3000, Summer S. Simpson 995, Henry D. Bradley 800, Mortimer F. Judd 5, and the balance were owned by James L. McGovern, W. F. Montagne, and L. W. Rotan, each owning 50. The defendant Harry S. Talmadge was in general charge of the business of the company. The plaintiff was an investment counsellor. The Post Publishing Company was a corporation, publisher of the Post, an evening paper, and the Telegram, a morning paper, in Bridgeport. Edward Flicker was its president and treasurer. For some time there had been expensive competition for circulation between the newspapers and with a view to ending this to their mutual advantage negotiations for a sale or merger had been conducted by Talmadge and Bradley for the Times-Star and Flicker for the Post, acting without corporate authority but upon the assumption that any plan approved by them would be satisfactory to their associates.

On June 7th, 1934, Talmadge met the plaintiff in New York at a conference and gave him a written memorandum appended in the footnote. This memo-

---

"June 7, 1934

"If a deal is made to merge the Times Star & Post Telegram within the next sixty days on a basis of substantially $350000 in cash and 37½% of the stock of a new Co. to go to Times Star in that case Times Star Co. will pay to Mr. Westbrook the sum of $25000 on completion of said deal. The word substantially meaning that these terms & the amount indicated may not be exactly these figures but figures acceptable to both parties, in that case the sum of $25000 is nevertheless to be paid. In the meantime negotiations will not be conducted through other parties— But if deal is not consummated in that case, Times Star Co has no obligations, *but* arrangements at the end of sixty days might be resumed on some other basis, the idea being that we are not to be obligated beyond sixty days, but also that we hope Mr. Westbrook will earn the fee indicated.

H. S. T."

randum was immediately turned over by Talmadge to
Bradley and thereafter the defendants Simpson and
Judd were informed of its terms; and after negotia-
tions between the plaintiff and Bradley, Talmadge pre-
pared a summary of the terms which he believed would
be satisfactory to himself and his associates Simpson,
Judd and Bradley. Thereafter, Westbrook presented
the terms to Flicker who refused to enter into any
negotiations upon the basis proposed; whereupon the
plaintiff returned to Talmadge and told him that he
had failed to accomplish the desired results, and al-
though nothing was said about modifying his agency
arrangement or of continuing or extending it, it was
understood between Talmadge and Bradley, on the
one hand, and Westbrook, on the other, that the latter
would continue his efforts to bring about some sort
of an agreement between the parties upon such other
lines as might be developed through negotiations.

After a short interval, Westbrook again approached
Bradley and suggested the possibility of a plan whereby
the Post Publishing Company would take over the
assets of the Times-Star Company but in lieu of a
cash payment would cause to be issued a number of
shares of preferred stock to be divided between the
stockholders of the Times-Star Company. From time
to time Westbrook conferred upon the matter with
Flicker, on the one hand, and Talmadge and Bradley,
on the other, and about July 19th Westbrook met
Talmadge and Bradley in New York and communi-
cated to them the result of his efforts. At this con-
ference, Talmadge and Bradley informed Westbrook
that his outline was in general satisfactory to them.
Westbrook informed them that Flicker preferred that
the stock should be callable at $550,000, and both Tal-
madge and Bradley expressed the opinion that it
should be callable at $750,000. A few days later, West-

brook informed Bradley that Flicker was also in general agreement with the terms outlined and it was arranged that Talmadge should come to Bridgeport on July 24th for a further conference. On that day, Talmadge came to Bridgeport and he and Bradley met Westbrook and a written memorandum, set forth in the footnote, was made of the terms that had theretofore been discussed, and it was arranged that Westbrook should call upon Flicker to advance the negotiations, if possible, toward the execution of a satisfactory contract. The defendants Simpson and Judd were informed of the terms of the proposal and approved them as outlined. At this conference, Talmadge informed Westbrook that the proposition, as embodied in the written memorandum, was to be presented to Flicker as an ultimatum.

In connection with the acceptance by Talmadge and his associates of the proposals outlined in the memorandum, a question arose as to the compensation to be paid the plaintiff. Nothing was said about any modification of the original agreement of employment, nor was any claim made that Westbrook in negotiating along the new line was fulfiling or attempting to fulfil the terms of the original employment, but Talmadge and Bradley then agreed with Westbrook that if a merger was accomplished through the issuance of

"Class A Stock—

"Indefinite number of shares, 5500 most convenient.

"No par, non-voting, non-assessable, callable, cumulative.

"$33,000 priority, participates in all dividends over $200,000. 30% to 70% for common.

"Protected against issue of senior securities by 75% assent to such issue.

"Callable at minimum of $550,000.00 or 25% of three year average of earnings capitalized as return upon an investment. Earnings for such a call derivation defined as operating net after taxes. Depreciation to be allowed to Government limit and maintenance limited to 5% of gross."

preferred stock, Westbrook would receive as compensation for his services 250 shares thereof. Westbrook agreed to this and attached a value of $100 each to the shares to be delivered to him. All the parties understood that the stock was being accepted as the fair equivalent of and in lieu of $25,000 in cash. Thereupon, Westbrook went to Flicker and gave to him the statement as a final proposition from the other·side. Talmadge, Bradley, Simpson and Judd were fully aware when they gave their consent to this statement that Westbrook would inform Flicker that the proposition had their joint approval; but neither Flicker nor Westbrook nor any of the defendants considered the statement as constituting a definite and final contract binding upon any of the parties, or as constituting anything more than an advance in the negotiations toward the consummation of a contract. Flicker stated to Westbrook that the conditions were satisfactory.

On the next day, Bradley and Flicker again agreed to submit the proposal to Flicker's attorney, David S. Day. They then proceeded to the office of the attorney and Flicker asked him to go carefully into the terms and point out any changes that should be recommended for his protection. The attorney recommended a change in the call provision of the stock in order to make it a definite amount rather than one computed on earnings over a period of years. Bradley was then summoned to the conference and the terms were read to him by the attorney, and Bradley thereupon assented to all of them with the exception of that involving the changed call provision. Bradley then consulted Talmadge, Simpson and Judd who agreed to the change in the call provision if Flicker would buy the white paper, ink and supplies of the Times-Star Company at cost. When informed of this

by Westbrook, Flicker refused to make such a purchase. Talmadge then requested Westbrook to go to Flicker again and inform him that the matter of supplies was the only thing standing in the way of the arrangement and ask him to reconsider. Thereupon, Westbrook again returned to Flicker who offered to buy the white paper alone, and after Westbrook had communicated this suggestion to Talmadge and Bradley, they accepted the proposal. This was on July 26th, 1934.

Day, the attorney, was then immediately called on the telephone by Westbrook and told to proceed with the drafting of an agreement. Following the conference with the attorney at his office, Bradley left with E. K. Nicholson, attorney for the Times-Star Company, a memorandum of the terms agreed upon with instructions to Nicholson to prepare the necessary contracts. The latter communicated with Day and between them they agreed that Day should prepare a draft of a contract. In the course of a few days, Day prepared the draft of a contract between the Times-Star Company and the Post Publishing Company, but when submitted to Nicholson it was found to contain provisions not covered in the proposal thus far agreed upon and not acceptable to Talmadge, Simpson, Bradley or Judd. Nicholson then informed Day that these provisions were unacceptable and the latter proceeded to draft a new contract, and again, at the insistence of his client, incorporated into the written contract terms not included in the original proposal and terms distinctly differing from the proposals. This draft was concluded by Day and a copy thereof handed to Nicholson on or about August 4th, 1934. At this point, Flicker insisted upon the terms of the contract as prepared by Day and the defendants were unwilling to accept the proposed contract in so far as it

departed from the proposals which had been discussed and agreed to on July 26th. On August 7th, all efforts to reach an agreement were abandoned. Thereupon, the plaintiff undertook to negotiate a cash sale and offered to proceed with such negotiations for a fee of 5 per cent. of the actual sale price. No merger or contract of any kind has ever been concluded between the Times-Star Company and the Post Publishing Company or between any of the parties named as defendants and Edward Flicker of the Post Publishing Company, and no negotiations were ever resumed between the parties after the failure to complete the proposals outlined in the paper of July 24th.

The vital point of the case is the finding of the trial court that the proposals agreed to on July 26th were not understood or intended by the parties to constitute a final contract but were accepted as a basis of general terms from which the parties might, by continuing the negotiations, proceed to the completion of an acceptable contract. In determining whether or not a broker is entitled to a commission, his "services are not the test, but rather the success of his effort in effecting a sale, or in producing a customer ready, able and willing to buy on the owner's terms." *Rosenfield* v. *Wall*, 94 Conn. 418, 422, 109 Atl. 409. "Whether the parties contemplated the necessity of a written draft as the final conclusion of their negotiations, as claimed by the defendant, was a question of fact." *Lawrence* v. *Hamilton*, 111 Conn. 493, 496, 150 Atl. 690; *Baretz* v. *Steinmetz*, 102 Conn. 148, 150, 128 Atl. 18; *Fruin* v. *Glassnap*, 97 Conn. 504, 508, 117 Atl. 547. The plaintiff "must prove, either that the owner had prescribed the terms upon which he would sell, and that the plaintiff had produced a customer ready, able and willing to buy upon those terms, or that the customer and owner had reached an agreement as to terms of sale,

and the customer was able to buy upon those terms. Proof of either set of facts is sufficient for the plaintiff's case, and the two are by no means identical. If, in placing the property in the agent's hands for sale, the owner has not fixed the terms upon which he will sell, the agent has not earned his commission unless and until the customer he produces has reached an agreement with the owner as to the terms of sale. If, however, the owner informs the agent of the terms upon which he will sell, and the latter produces a customer ready, able and willing to buy upon those terms, he has earned his commission though the sale falls through because the owner refuses to sell on such terms." *Hancock Co., Inc.* v. *Poli Corp.*, 113 Conn. 545, 551, 155 Atl. 914.

The finding of the trial court upon the pivotal fact of the case is supported by the other facts found and by the evidence. It finds further support in the memorandum itself upon which the proposals were stated. Considering the importance of the transaction to the parties, the memorandum appears no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms. The question before the trial court was whether the parties intended that the several points negotiated and agreed upon should constitute a final contract, or whether they contemplated the further development of those terms in an executed written contract. Where matters of importance to both sides and the legality of the whole proposition remained to be settled after competent legal advice, the trial court was justified in finding that the plaintiff had not brought the parties to an agreement, and was therefore, not entitled to compensation.

There is no error.

In this opinion the other judges concurred.