SUFFIELD DEVELOPMENT ASSOCIATES LIMITED
PARTNERSHIP *v.* SOCIETY FOR SAVINGS
(SC 15727)

Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued October 1, 1997—officially released March 3, 1998

*Ben M. Krowicki*, with whom was *Ann M. Siczewicz*, for the appellant (defendant).

*Richard P. Weinstein*, with whom, on the brief, were *Kerry M. Wisser* and *Nathan A. Schatz*, for the appellee (plaintiff).

*Opinion*

BORDEN, J. The dispositive issue in this appeal is whether there was sufficient evidence from which the jury could have found that a contract for a loan existed between the plaintiff and the defendant. The defendant, Society for Savings, appeals[1] from the judgment of the trial court in favor of the plaintiff, Suffield Development Associates Limited Partnership, rendered on the jury's verdict finding a breach of contract against the defendant and awarding damages in the amount of $2.5 million. The defendant claims that: (1) the plaintiff's breach

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

of contract claim was time barred under General Statutes § 52-581;[2] (2) the plaintiff's claim for breach of contract for a loan in excess of $50,000 was barred by the statute of frauds, General Statutes § 52-550 (a) (6);[3] (3) there was insufficient evidence to support the jury's finding that a contract existed; (4) the award of damages was erroneous in that the damages claimed were not measured in accordance with Connecticut law; and (5) the award of prejudgment interest pursuant to General Statutes § 37-3a was improper. We agree with the defendant's third claim, namely, that there was insufficient evidence to support a finding that a contract existed and, therefore, we reverse the judgment and order a new trial limited to the plaintiff's remaining claim of promissory estoppel.

The plaintiff brought this action against the defendant claiming, in one count, breach of a contract, and, in a second count, promissory estoppel.[4] The defendant denied the breach of contract and promissory estoppel

[2] General Statutes § 52-581 provides in relevant part: "Action on oral contract to be brought within three years. (a) No action founded upon any express contract or agreement which is not reduced to writing, or of which some note or memorandum is not made in writing and signed by the party to be charged therewith or his agent, shall be brought but within three years after the right of action accrues. . . ."

[3] General Statutes § 52-550 provides in relevant part: "Statute of frauds; written agreement or memorandum. (a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor or administrator, upon a special promise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default or miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof; or *(6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars*. . . ." (Emphasis added.)

[4] The plaintiff, in a third count, also had alleged violations of the Connecticut Unfair Trade Practices Act, General Statutes §§ 42-110a through 42-110q, but subsequently withdrew that claim during trial.

allegations, and raised the special defenses of the applicable statute of limitations and the statute of frauds.[5] The jury returned a verdict in favor of the plaintiff on the breach of contract claim. The trial court denied the defendant's motions to set aside the verdict, for judgment notwithstanding the verdict, and for a remittitur, and rendered judgment for the plaintiff on the verdict.

The pertinent evidence, viewed in the light most favorable to sustaining the jury's verdict, reveals the following facts. James Sutton, Barrett Krass and James Heneghan were friends who had decided to combine their skills in developing and expanding existing commercial real estate ventures. In June, 1986, they were approached by a commercial real estate broker about the possibility of purchasing Suffield Village, a commercial property located on Main and Bridge Streets in Suffield, which was owned by Suffield Village Partnership. The property included a 79,000 square foot, multistory, U-shaped building located on 6.25 acres of land. The three men had no interest in purchasing the property except for further development, contingent upon adequate bank financing.

After preliminary discussions with the owners of the property, the three men met on September 17, 1986, with John Logan, a commercial loan officer of the defendant, to discuss the possibility of assuming the existing mortgage on the property and of developing a 20,000 square foot office building on it. On December 11, 1986, Sutton, Krass and Heneghan, as Suffield Development Associates, a general partnership, executed a bond for deed for the purchase of Suffield Village for $2.25 million.

---

[5] The defendant subsequently withdrew the special defense of the statute of frauds, but then renewed it without objection by the plaintiff. In addition, the defendant raised certain other special defenses that it subsequently withdrew and did not seek to renew.

Suffield Development Associates subsequently: (1) retained an attorney to obtain approvals from the historic commission, the conservation commission and the town planning and zoning commission for the construction of the office building; (2) engaged an engineering firm to design the building layout, parking lot configuration, utilities, lighting, landscaping and traffic studies; and (3) hired an architect to design the office building and renovation of the existing building. They also discussed terms and conditions of financing with Logan. Certain agreed-upon terms were set forth in a letter, dated March 3, 1987, that was signed by Logan, on behalf of the defendant, and by Krass on behalf of Suffield Development Associates.

The March 3, 1987 letter: (1) anticipated a permanent loan from the defendant in the amount of $3.2 million to cover the construction financing for the proposed project and assumption of the existing mortgage; (2) established the terms of refinancing; and (3) set the interest rate to be charged.[6] Although the letter specifically stated that it was "not a commitment," an internal

---

[6] The March 3, 1987 letter to Krass provided:

"1. We would allow, subject to the receipt and approval of your individual financial statements, the Suffield Development Associates to assume the existing mortgage of approximately $1,200,000 which we presently have on the property. The existing guarantors would then be released upon their payment to us of the appropriate prepayment fee.

"2. Society for Savings would allow the seller, Suffield Village partnership to take back a subordinated second mortgage in the amount of $650,000.

"3. We would make a credit loan of $100,000 to the principals of Suffield Development Associates secured by a third mortgage on the property.

"4. You would apply to Society for Savings for a new first mortgage in the amount of $3,200,000 and not exceeding 75[%] loan to value. This application would be reviewed when we have received an appraisal of the property after completion of the improvements . . . . The appraisal will be addressed to the bank.

"The loan application would further be accompanied by:

"(a) Evidence of partnership equity of $800,000.

"(b) All necessary zoning permits for a 20,000 [square foot] new office building and satisfactory leases in hand for at least 30% of the space.

"(c) The principals of Suffield Development Associates will remain as

memorandum of the defendant written in April, 1987, referred to the March 3, 1987 letter as a "commitment." Furthermore, Sutton, Krass and Heneghan testified that they believed that the letter was a formal loan commitment from the defendant.

On May 1, 1987, the Great Atlantic & Pacific Tea Company, Inc. (A&P), the anchor tenant in the existing building, expressed in a letter to Suffield Development Associates its interest in expanding its space requirements by almost 50 percent.[7] As a consequence of this correspondence, Suffield Development Associates changed the focus of the development project to make the retail expansion its first priority. Suffield Development Associates then scheduled a meeting on May 5, 1987, with Logan to determine whether the defendant would provide financing for the proposed expansion of retail space in addition to the anticipated construction loan.

The new project entailed the purchase of 4.03 acres of adjacent land in order to construct a 27,000 square

guarantors on the entire amount of the loan until the debt service coverage exceeds 1.20. All leases and operating expenses must be submitted to the Lender for its review and approval.

"5. The pricing of the new first mortgage would be as follows:

"(a) During the construction period of up to 24 months the loan will be priced at our Base Rate plus 1 1/2%.

"(b) The permanent loan will have a starting rate of 2.75% over the 3 year Treasury note for a term of 3 years.

"(c) The commitment fee will be 1% of the new money above the original loan of $1,200,000, and payment of the prepayment fee as stated in the loan.

"If this is your understanding of the terms of the loan application please sign and return the attached copy along with the signed financial statements.

"This is not a commitment by Society for Savings to change or refinance the existing mortgage, but simply a letter understanding of the terms of an application for an assumption and refinance."

[7] A&P occupied approximately 22,000 square feet of space, of which approximately 13,000 square feet was retail space. The May 1, 1987 letter indicated A&P's desire to expand its retail space by 9100 additional square feet.

foot retail expansion abutting the present A&P, a complete renovation of the existing structure, and the construction of a 20,000 square foot office building. At that meeting, Logan expressed confidence in the defendant's ability to finance the project, with the caveat that the defendant wanted the entire project to be financed by only one construction loan. Logan confirmed that the same terms and conditions as provided in the March 3, 1987 letter could be obtained for the new funds that Suffield Development Associates sought. See footnote 6. At the May 5, 1987 meeting, Suffield Development Associates did not have a definitive estimate of its upcoming financial needs for this project, and instead provided the defendant with a range of $4 to $5 million for the expanded project.

Suffield Development Associates then incorporated as Suffield Development Corporation, and became the general partner in a newly formed limited partnership called Suffield Development Associates Limited Partnership, the plaintiff in this case. The purpose of the limited partnership was to raise the $800,000 partnership equity required under the commitment letter. The plaintiff raised the necessary funds through an offering memorandum provided to potential investors. That offering memorandum included information on the proposed office building and referred to the fact that the defendant would provide the financing for it. That document also mentioned the possibility of a retail expansion, and gave assurances that no further capital would be sought from the limited partners in the event of that expansion.

The parties met again on July 7, 1987, to discuss the project further, at which time the plaintiff proposed a construction loan of "a little over $4 million" for the project. Logan affirmed the reasonableness of those figures, and told the plaintiff to pursue the purchase of the land and the required permit approvals. During the

trial, there was evidence presented to support the plaintiff's account of what was discussed at the July 7 meeting.[8]

On July 28, 1987, the defendant provided the plaintiff with a $100,000 loan to help pay for the design and approvals of the expanded project. The plaintiff consummated the purchase of the property on July 30,

[8] The trial transcript contains the following testimony by Sutton during direct examination by Richard Weinstein, the plaintiff's attorney:

"Q. What was discussed on that occasion, on July 7, 1987, with Mr. Logan concerning this project?

"A. It was a reconfirmation of the numbers associated with the cost of the expansion. In other words, what would we require in terms of construction refinancing, and reconfirmation of now their commitment to us to go forward with this project as we now envisioned it, which included an office building, a retail expansion and a renovation and rehabilitation of the existing shopping center.

"Q. Did you discuss specific numbers with Mr. Logan on that occasion of July 7, 1987, concerning the amount needed for the construction?

"A. Yes, we verbalized what we thought would be the approximate gross numbers.

"Q. How much did you verbalize, sir?

"A. The—do you want me to get into any detail or just give you the top numbers.

"Q. No, tell me everything you discussed with Mr. Logan about the numbers in that meeting of July 7, 1987.

"A. Well, in terms of the rehab 79,000 square feet, and the project—and it normally costs $10 to $15 a square foot to do the type of renovation or rehabilitation we were thinking about, and the primary reason—well, one of the major benefits of the rehab is that of the 79,000 square feet, only 64,000 were leasable. The rest were all common corridors and common areas. And in the renovation we felt we were—would be able to reduce the amount of common area so that 74,000 square feet would now become leasable rather than 64,000. We would be able to add 10,000 square feet to the lease.

"So we had to determine how many square feet would be impacted by that type of renovation, plus we would have to add an elevator, and we looked at those numbers. They came out to around $900,000.

"Q. That was an elevator in the retailing area?

"A. In the existing facility.

"Q. Okay.

"A. As part of the renovation and rehab we had to add an elevator in order to have access to all three floors, and that was part and parcel to the renovation and rehab. And our estimates to do that, the renovation and

1987. Thereafter, the plaintiff pursued the acquisition of the additional land from Suffield Academy, and the various approvals from the state and town regulatory agencies. The plaintiff completed the approval process, securing the final approval in December, 1989.

On June 30, 1988, the plaintiff signed a twelve month demand note with the defendant for $200,000, one half of which was used to pay off the outstanding $100,000 loan, and the other one half of which was used to continue the approval and design process. Logan intended this $200,000 demand note to be paid from a refinancing

rehab, including the courtyard area that had to be renovated was in the neighborhood of about $900,000.

"Q. What else was discussed with Mr. Logan about the costs?

"A. The expansion was in the neighborhood of about $1.6 million. It was roughly $35 to $40 a square foot to build that type of building. We estimated in July that we would require about three acres. Turned out at a later date we needed more, we needed four acres, but at that point in time we looked at three acres at around $75,000 an acre and we also looked at the site work associated with the retail expansion as well as the site work associated with the new parking lot, and those numbers came out to around $1.6 million. That also caused us to lessen the amount of money that we had previously required for the office building.

"Q. Why?

"A. Because some of the site work was now incorporated into the site work we were estimating for the retail expansion and was really being picked up there. We no longer had to do the whole parking lot as part of the office building. We were now doing it as part of the retail expansion. So that number came down from the $1.9 [million] to somewhere in the $1.6 million area.

"Q. Did you discuss an overall number with Mr. Logan in that July 7, 1987 meeting which would be necessary to do all of the rehabilitation expansion and the office building?

"A. It was—we added those numbers up. We just—those came out to, on a construction point of view, came out to a little over $4 million.

"Q. What did Mr. Logan tell you about your numbers and projections in connection with this proposal?

"A. Again, I don't remember specific words. I think there was an affirmation that what we would—were talking about costwise was reasonable and that we have to go out and get the approvals, we have to go out and—first of all, we have to get the land and then we have to go out and get all the approvals associated with the renovation and rehab which we didn't need land for, but then we needed the land for the retail expansion."

of the project through the contemplated permanent loan from the defendant.

At the same time the plaintiff was procuring the necessary approvals, it also was negotiating with prospective tenants to occupy the proposed retail space. By the end of 1989, it had obtained letters of intent from two restaurants and from a pharmacy. Logan was kept informed, by telephone and through regular meetings, of the plaintiff's progress in complying with the enumerated conditions.

In early March, 1990, Sutton telephoned Logan to inform him that they were about to sign a lease with the pharmacy, which would have met the 30 percent preleasing requirement for the retail expansion space only. It was the plaintiff's intention that once the lease was signed, it could begin the retail expansion construction phase of the project. During that telephone conversation, Logan informed the plaintiff that the defendant was currently only financing construction projects that were 100 percent preleased. Logan informed the plaintiff that, due to the changed requirements for financing, the defendant would be unable to finance the project.

The plaintiff thereafter attempted to secure replacement financing from approximately thirty other lending sources. In May, 1990, the defendant requested payment of the $200,000, twelve month demand note executed in June, 1988, because it was no longer financing the project. During the summer of 1990, Logan attempted to help the plaintiff find alternate financing, and represented the project to other lending institutions as viable. Despite its efforts, the plaintiff was unable to obtain financing to achieve its approved project.

Thereafter, the plaintiff filed this action against the defendant. In the first count of the complaint, the plaintiff claimed that the defendant had breached a contract to lend the plaintiff acquisition funds, development

funds and construction funds to expand the office and retail portions of the Suffield Village Shopping Center. In the second count of the complaint alleging promissory estoppel, the plaintiff claimed that the defendant, through its assurances, had led the plaintiff to continue expending time and money on development, and had caused the plaintiff not to seek financing elsewhere until alternate financing was no longer available. The defendant answered the complaint denying the existence of a breach of a contract, and denying the promissory estoppel allegation. In addition, the defendant raised the defenses of the statute of limitations; General Statutes § 52-581; and the statute of frauds. General Statutes § 52-550 (a) (6).

A jury trial ensued on the breach of contract and promissory estoppel counts. The two theories were presented to the jury as mutually exclusive in the jury instructions and in the verdict forms. The jury returned a verdict for the plaintiff awarding $2.5 million on the breach of contract theory. It did not specifically return a verdict on the promissory estoppel count. The defendant filed motions to set aside the verdict, for judgment notwithstanding the verdict, and for a remittitur, which motions the trial court denied. The trial court rendered judgment for the plaintiff in accordance with the jury verdict, and granted its motion for offer of judgment interest. This appeal followed.

We first address the defendant's claim that the plaintiff presented insufficient evidence to support the verdict. The defendant maintains that the plaintiff did not produce sufficient evidence to show an agreement as to an essential term of the alleged contract, namely, the loan amount.[9] We agree.

[9] The defendant also claims that there was insufficient evidence to support a verdict regarding certain other material terms of the agreement, specifically, the advancement of loan proceeds, guarantees, and the method of loan repayment. Because we agree that the absence of sufficient evidence

In reviewing the jury's verdict, "we construe the evidence in the light most favorable to sustaining the verdict." *Donner* v. *Kearse*, 234 Conn. 660, 681, 662 A.2d 1269 (1995); *Oakes* v. *New England Dairies, Inc.*, 219 Conn. 1, 12, 591 A.2d 1261 (1991); *Bartholomew* v. *Schweizer*, 217 Conn. 671, 687, 587 A.2d 1014 (1991). "The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 242 Conn. 255, 277, 698 A.2d 838 (1997); *Mather* v. *Griffin Hospital*, 207 Conn. 125, 130, 540 A.2d 666 (1988).

Under established principles of contract law, "an agreement 'must be definite and certain as to its terms and requirements.'" *Presidential Capital Corp.* v. *Reale*, 231 Conn. 500, 506, 652 A.2d 489 (1994); 1 Restatement (Second), Contracts § 33, comment (e), p. 94 (1981). In *Garre* v. *Geryk*, 145 Conn. 669, 674, 145 A.2d 829 (1958), we stated that a basis for determining the total purchase price and the amount of the purchase money mortgage were essential terms for the validity of the contract. We have also stated that where "the memorandum appears [to be] no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms," the plaintiff has failed to prove the existence of an agreement. *Westbrook* v. *Times-Star Co.*, 122 Conn. 473, 481, 191 A. 91 (1937). Applying these principles to the evidence viewed most favorably to sustaining the jury verdict, we conclude nonetheless that there was insufficient evidence to support a finding that the parties agreed on a definite and certain loan amount.

of a definite and certain loan amount was fatal to the formation of a contract between the parties, we need not address the other claims of the defendant regarding the alleged agreement.

The plaintiff claims that the contract was formed in July, 1987.[10] It follows that the plaintiff intends the July 7, 1987 meeting to be the actual date of formation of the contract, because the subsequent July, 1987 events did not concern the formation of a contract. Also, the plaintiff does not claim that the contract was for the $3.2 million project, because that was an entirely different and smaller project. The plaintiff does claim, however, that subsequent conduct of the defendant, in its conversations and letters, can be used to illuminate what the defendant meant by its conduct in the July 7, 1987 meeting. We, therefore, focus on the July 7, 1987 evidence and any evidence of subsequent conduct that is relevant thereto.

During the course of the July meeting, Sutton estimated the cost of each phase of the project. See footnote 8. Sutton "verbalized what [he] thought would be the *approximate* gross numbers." (Emphasis added.) He testified about "normal" costs of $10 to $15 per square foot for renovation and rehabilitation placing the *estimate* of the renovation to be "in the neighborhood of *about* $900,000." (Emphasis added.) The expansion was also "in the neighborhood of about $1.6 million." He referred to the fact that the expansion would cost *"roughly* $35 to $40 a square foot." (Emphasis added.) Sutton continued his estimation of the site work associated with the project "[coming] out to around $1.6 million." Other indications of the attenuated nature of the figures provided to the defendant at that meeting is that the plaintiff "estimated . . . that we would require about three acres [of additional land]. Turned out at a later date we needed more . . . ."

[10] In its brief, the plaintiff points to the May and July, 1987 meetings as being the basis for the creation of the contract for the expanded project. At oral argument in this court, however, the plaintiff stated that it considered the "magic date" for the formation of the expanded contract to be July, 1987.

Although the estimates taken from the July 7, 1987 meeting total $4.325 million, that precise figure is not referred to in any correspondence, nor is it even repeated anywhere. Thus, that specific figure can only be reasonably construed as a sum of estimates. As such, it is no more specific than its components. Also significant is that none of the plaintiff's witnesses testified to any agreement regarding a specific loan amount.

Further indication that a precise loan amount was never agreed upon is the absence of such a figure in the plaintiff's brief. It is true that, at oral argument before this court, the plaintiff directed our attention to two letters written by the defendant in May, 1990, the first of which named a figure of "approximately $4.5 [million]," and the second of which reported the "amount needed would be about $4.5 [million] . . . ." These figures, however, are no more specific than the figures discussed on July 7, 1987. This subsequent conduct after the claimed formation of the contract is lacking in sufficient certainty for a fact finder reasonably to conclude that a contract was formed in July, 1987.[11]

[11] We disagree with the contention of the dissent that there was legally sufficient evidence from which the jury could have found a contract in the specific amount of $4.5 million. Despite the dissent's assertion that the parties had agreed to increase the loan amount from $3.2 million to $4.5 million, it does not indicate the specific evidence from which it draws this exact figure. The two letters on which the plaintiff relies refer to *approximations* of $4.5 million, but never to any specific sum. The approximate contract amount is not enforceable, because that essential term of the contract is not stated with the required degree of specificity.

In this connection, we disagree with the dissent's computation of the loan amount based on Sutton's testimony of the July 7, 1997 meeting. Sutton testified that the plaintiff would need "around" $900,000 to complete the renovation of the existing shopping center building, and he estimated the retail expansion would cost "in the neighborhood of" $1.6 million. He also testified, however, that, as a result of some of the site work for the retail expansion, the estimated amount required for the construction of the office building could be decreased from $1.9 million to "somewhere in the $1.6 million area." In addition, the plaintiff intended to purchase the additional land for "around" $225,000. See footnote 8 of this opinion. These approximations and rough calculations total only $4.325 million, not $4.5 million.

Having concluded that the plaintiff produced insufficient evidence to support the jury's verdict on the breach of contract claim, we next address the scope of our remand. The trial court's charge to the jury instructed it to deliberate separately on each count, and presented the two theories as mutually exclusive. Specifically, the court charged that "if you find for the plaintiff, you can only find on count one or count two." In addition, similar instructions were given as to the verdict forms. Because it is unclear, under these instructions, whether (1) the jury considered both claims and then returned a verdict for the plaintiff on the first count, thereby rejecting the second count, or (2) whether the jury found a breach of a contract and, therefore, never considered the second count, we remand the case for a new trial limited to the plaintiff's claim of promissory estoppel.

The judgment is reversed and the case is remanded with direction to render judgment for the defendant on the breach of contract count, and for a new trial on the promissory estoppel count.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

BERDON, J., dissenting. Although the majority opinion correctly sets forth our standard of review with respect to the jury's verdict, it misapplies that standard. The standard of review is as follows: "A verdict of a jury prevails unless unsupported by the evidence . . . or unless it is so palpably against the evidence as to indicate prejudice, partiality, corruption, confusion or

---

Indeed, Sutton's computation of the plaintiff's projected needs was "a little over $4 million."

Finally, if the dissent were correct in its assessment of $4.5 million in "new money," then that amount added to the $1.2 million assumption would indicate that the plaintiff intended to borrow $5.7 million for this project, a number that even the plaintiff has never suggested as the amount of the loan promised by the defendant and that was never discussed at trial.

lack of understanding of the issues by the jury. . . . The conclusion of a jury on issues of fact, if it is one at which honest men acting fairly and intelligently could arrive reasonably, must stand, *even though the opinion of . . . this court might be that a different result should have been reached.* The credibility of each witness and the weight to be accorded to his testimony is for the jury, and the evidence must be given the most favorable construction of which it is reasonably capable." (Citations omitted; emphasis added.) *Harris* v. *Clinton,* 142 Conn. 204, 209, 112 A.2d 885 (1955). "The concurrence of the judgments of the [trial] judge and the jury who saw the witnesses and heard the testimony is a powerful argument for sustaining the action of the trial court. We are to decide only whether there was evidence which the jury could have reasonably credited and from which they could have fairly reached the conclusion they did. In the last analysis, the defendants ask that this court retry the case on the evidence. We do not do this." *Lopez* v. *Price,* 145 Conn. 560, 564, 145 A.2d 127 (1958).

I agree with the trial judge that there was sufficient evidence to support the verdict. "It is a fundamental principle of contract law that the existence and terms of a contract are to be determined from the intent of the parties. *Menard* v. *Gentile,* 7 Conn. App. 211, 213, 508 A.2d 456 (1986). The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were. *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 199, 520 A.2d 208 (1987). Whether the parties intended to be bound without signing a formal written document is an inference of fact for the trial court that we will not review unless we find that its conclusion is unreasonable. *Menard* v. *Gentile,* supra, 213." *Steeltech Building Products, Inc.* v. *Edward Sutt Associates, Inc.,* 18 Conn. App. 469, 471–

72, 559 A.2d 228 (1989). "This process of inference is peculiarly a jury function, the raison d'etre of the jury system." *Pierce* v. *Albanese*, 144 Conn. 241, 256, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957).

The defendant submitted evidence to the jury that allowed it to conclude that a contract existed between the parties regarding financing for the Suffield Village Project, a shopping center. The basic agreement of the parties was memorialized in a "letter of understanding" issued by the defendant Society of Savings and dated March 3, 1987 (letter of understanding), and agreed to by the plaintiff, Suffield Development Associates Limited Partnership, as evidenced by its signed acceptance by one of the partners on April 20, 1987. The agreement provided that the defendant would furnish first mortgage financing in the amount of $3.2 million (including a then existing first mortgage in the amount of $1.2 million) subject to certain conditions, which included evidence of the plaintiff having raised equity capital of $800,000 and having secured satisfactory leases for 30 percent of the space in the shopping center. Although the letter of understanding provides that "[t]his is not a commitment by [the defendant]," there is sufficient evidence in the record that the parties, in fact, intended the letter to set forth their binding agreement on the financing of the Suffield Village Project.

Surely, there was an abundance of evidence from James Sutton, Barrett Krass and James Heneghan, the three principals of the plaintiff's general partner, Suffield Development Corporation, that the parties intended the letter of understanding to be their binding agreement as of April 20, 1987. Sutton testified that even though the defendant never issued a formal commitment, he understood the countersigned letter of understanding to be a commitment letter. Heneghan testified that if the plaintiff did all the things listed in

the letter, the letter was a commitment, and if the plaintiff did not do those things, it was not a commitment. Finally, Krass testified that, the plaintiff had a loan commitment from the defendant subject to certain terms and conditions.

Furthermore, the plaintiff's expert witness, Robert J. Nocera, who had twelve years experience in banking, including a position as a lending officer for Waterbury Savings Bank, now known as Centerbank, testified that pursuant to banking practices, the letter of understanding was a commitment to finance the shopping center. Nocera testified that "I've never seen those words [in the letter] used where that doesn't indicate a firm commitment on the part of the bank. Terms of financing are terms of financing. They are not 'Maybe we'll do it. . . .' " After the plaintiff's attorney asked him whether the sentence in the opening paragraph of the letter— "At your request I am sending you this letter to outline the terms of financing"—meant that the defendant was going to provide the financing, Nocera testified, "I will say this. In my twelve years as a banker I never would have written those words or offered them to a client unless I was prepared to also support them with the financing that . . . I've offered." Moreover, the internal memorandum of the defendant, dated April 23, 1987, three days after the partners agreed to the letter of understanding issued by the defendant, confirms this initial agreement. That internal memorandum referred to the letter of understanding as a "commitment letter," and provided that the loan would be "$3.2 million construction/permanent loan to pay-off the [$1.2 million mortgage due the defendant]" and *specifically* set the interest rate as "a three year variable, 2.75% over 3 year Treasury Notes."

Subsequent to the issuance of the letter of understanding, the plaintiff and the defendant amended their April 20, 1987 agreement to accommodate changing

conditions created by the plaintiff's plans for building an expanded shopping center. Specifically, the plaintiff needed the defendant to increase its actual financing— from $2 million of new money to approximately $4.5 million—to allow the plaintiff to remodel the existing site and to acquire additional acreage for the project from nearby Suffield Academy. In May, 1987, the defendant gave its approval of the plaintiff's expansion plans and agreed that the plaintiff needed a larger loan that would consolidate the previously agreed upon financing with the planned rehabilitation and retailing expansion loan. At the July 7, 1987 meeting,[1] the defendant reconfirmed its commitment to the plaintiffs to go forward with the project—the office building, retail expansion and renovation and rehabilitation of the existing shopping center. At that meeting of July 7, 1987, the defendant agreed to the increased loan amount of $4.5 million.[2] Soon after this meeting, the defendant, demonstrating its commitment to the project, advanced to the

---

[1] In order to reach its conclusion that there was insufficient evidence to support the finding that a contract existed, the majority focuses solely on the July 7, 1987 meeting between the parties as if anything before that date constituted a social intercourse between the plaintiff, its constituent partners and the defendant. Although the plaintiff conceded at oral argument that the "magic date" was July, 1987, that concession was *for the amendment* of the agreement by the parties with respect to the increase of the actual loan amount from $2 million of new money to $4.5 million.

The majority concludes that because the parties never agreed upon a specific loan amount at the July, 1987 meeting, or at any later date, the fact finder reasonably could not have concluded that a contract was formed in July, 1987. In my view the parties had a valid agreement for $2 million in new money prior to July 7, 1987, by their acceptance of the letter of understanding on April 20, 1987. The agreement was extended through subsequent negotiation in their July, 7, 1987 meeting, in which specific dollar amounts and square footage figures were addressed and which resulted in an amended agreement for a loan of new money in the amount of $4.5 million. See footnote 2 of this dissent.

[2] The majority would have us believe that there was insufficient evidence to support the specific amount of a $4.5 million loan commitment by the defendant, but that is not the case. The defendant agreed to the original $3.2 million loan to allow the plaintiff to "pay-off" its "$1.2 million assumption of [a then] present [Society for Savings] mortgage on the Suffield Village

plaintiff $100,000 to pay for the architect and engineer's cost in redesigning the planned addition to the shopping center.

One year later, the defendant underscored its commitment to the expanded project by advancing the plaintiff $200,000 to use as working capital for its expanded construction plans. In its June 16, 1988 loan brief, the defendant stated that repayment of the $200,000 loan would come "[f]rom the refinance of the shopping center." The plaintiff introduced the transcripts of prior testimony of John J. Logan, the defendant's loan officer, in which Logan stated that he anticipated at the time he wrote the loan brief that the refinancing of the shopping center would come from the defendant.The plaintiff

Shopping Center," and to "provide funds for the construction of a [twenty thousand] square foot office building." Therefore, under the original loan agreement, the defendant specifically agreed to give the plaintiff $2 million in *new money* for its planned Suffield Village Project.

On July 7, 1987, the parties met to discuss the plaintiff's capital needs for its planned expansion of the Suffield Village Shopping Center. James Sutton testified that it was agreed at the meeting that the plaintiff would need approximately $900,000 to complete the renovation and rehabilitation of the existing shopping center building, and $1.6 million to purchase additional property, build the addition to the shopping center building and complete site work associated with the retail expansion and the new parking lot. At this meeting, as noted by the majority, John J. Logan, the defendant's loan officer, "affirmed the reasonableness of those figures, and told the plaintiff to pursue the purchase of the land and the required permit approvals."

Therefore, there was sufficient evidence upon which the jury could have concluded that the defendant agreed to loan $2.5 million for the expanded project in addition to the prior $2 million, for a total of $4.5 million in new money.

In footnote 11 of its opinion, the majority confuses the basis of the plaintiff's action and the obvious theory upon which this case was tried. The defendant had an existing outstanding loan secured by a first mortgage in the amount of $1.2 million on the Suffield Village Shopping Center, which the plaintiff assumed when it took title to the shopping center. The plaintiff brought this action based upon the defendant's *agreement* to lend the plaintiff $4.5 million in new money to complete its planned Suffield Village Project, which, in effect, would have increased the outstanding loan to $5.7 million, to be secured by a mortgage on the shopping center.

fulfilled the conditions of the April 20, 1987 contract for $3.2 million ($1.2 million existing first mortgage in favor of the defendant, and $2 million in new money), which conditions were incorporated into the amended loan for $4.5 million in new money, by raising $800,000 of equity capital and by securing leases for 30 percent of the space in the shopping center. The defendant then informed the plaintiff in March, 1990, that it would not finance the project because it now required, contrary to the parties' agreement, proof that the plaintiff had leased 100 percent of the space. Surely, on the basis of the evidence before it, the jury could have concluded that no agreement existed; *but, it did not so conclude.* The determination of the parties' "contractual commitments is a question of the intention of the parties, and an inference of fact. As an inference of fact, it is not reversible unless the [jury] could not reasonably have arrived at the conclusion that it reached." *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 274–75, 439 A.2d 314 (1981). Like *Bead Chain Mfg. Co.*, this "is not the case here." Id., 275. In my view, there was sufficient evidence to support the jury's verdict that the parties had entered into a contract and that the defendant breached that contract.

Accordingly, I would affirm the trial court's refusal to set aside the jury verdict based upon sufficiency of evidence and go on to decide the remaining issues.