[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I
The plaintiffs, 111 Whitney Avenue, Inc. and Gaynor/111 Whitney Avenue Partnership, have filed this action claiming that they have suffered economic damages as a result of certain breaches of an alleged development agreement by the defendant, Department of Mental Retardation (DMR). The plaintiffs claim they undertook the development of two homes in New Haven and one in Litchfield for individuals with disabilities in reliance on certain oral representations and written letters in which the defendant agreed to provide both tenants and financial remuneration for a period of at least ten years. The defendant strenuously denies such claims and maintains that no such agreement ever existed.
By stipulation of the parties, the issues were bifurcated and the witnesses were limited to testimony concerning only whether an agreement was created.[1] The plaintiff produced a number of witnesses including: Mark Gaynor, an investor, psychologist and partner in the Gaynor/111 Whitney Avenue Partnership; Harvey Anderson, a builder; David Banti, an accountant; Edward Marcus, investor, sole shareholder of 111 Whitney Avenue, Inc., and counsel of the plaintiff partnerships; Audrey Rowe, former Commissioner of the Department of Income Maintenance (DIM); Thomas Tisdale, an officer of the now defunct provider/manager/"tenant" of the subject homes; and Frank DeBernardo, an employee of the defendant. The defendant's sole live witness was Antoinette Richardson, former Commissioner of the defendant.
The plaintiffs' claim is that representatives of both the defendant and the DIM made oral statements that the investors of the partnerships relied on in developing the three properties at issue. Mark Gaynor testified that a fellow tenant named Michael Raymond conducted a business known as NCDC of Connecticut (NCDC) which operated homes for individuals with mental retardation. Mr. Raymond advised him that he was looking for investors and Mr. Gaynor discussed this with his friend Edward Marcus. Mr. Marcus testified that in 1988, on two different occasions, he called Attorney General Clarine Riddle, whom he knew from the Corporation CT Page 4261 Counsel Office of the City of New Haven, to obtain information about the potential investment. Mr. Marcus and Mr. Gaynor testified that at some time in the first quarter of 1989, they met with Antoinette Richardson, who was, at that time, the defendant's Director for Region One (the northwestern part of the state). Ms. Richardson testified that she had no memory of such a meeting. Mr. Marcus also stated that he met with Ron Dune of the Department of Social Services (DSS) in that same quarter.[2]
According to certain telephone logs, Mr. Marcus had further telephone conversations with Attorney General Riddle in both 1989 and 1990, and with Lorraine Aaronson, Commissioner of DSS, and with Assistant Attorney General Menchel, in February 1990. Mr. Marcus also testified that he met with Ron Dune during that period.
The three properties that are involved in this litigation, namely, Monroe Street, New Haven, Quinnipiac Avenue, New Haven and Campville Road, Litchfield are just some of the properties that the plaintiffs or their related partnerships developed. Group homes throughout the state were being developed by private investors as a result of a 1984 United States District Court decision. Mr. Gaynor and 111 Whitney Avenue, Inc. entered into their partnership agreement in April 1989, and the Monroe Street property was purchased and leased to NCDC in May 1989. A second partnership was formed with 111 Whitney Avenue, Inc. and a group of investors which became known as the Quinnipiac Avenue Associates Partnership in October 1990. This partnership purchased and leased to NCDC the Quinnipiac property in that same month. Finally, a third partnership was formed with 111 Whitney Avenue, Inc. and a group of investors, including Mrs. Gaynor, and the Campville property was developed and leased to NCDC in August 1991.
The plaintiffs argue that an agreement was formed based on these previously mentioned telephone calls and meetings and on certain documents that had been prepared both in connection with the subject properties as well as those for different investors. Mr. Marcus testified that the message of the telephone calls, meetings and correspondence was definite and clear: that if his investors developed properties which met the defendant's and DSS' approval and were thus certified and licensed, the DMR would guarantee payment for the use of the facility for a period of not less than ten years. The arrangement was such that the defendant would enter into a agreement with a provider, such as NCDC, which would then lease the home from the developer. The provider agreements were for a one year term, in the event the provider had to be replaced, but the real estate leasing agreement was for a period often years. Both Mr. Marcus and Mr. Gaynor testified that they were told by Ms. Richardson that if a provider required replacement, a new provider would be immediately installed or the defendant would seek to have a receiver CT Page 4262 appointed to continue the operation of the home. They emphasized that they were told that, in any event, the rental payments, that is the payments the DSS paid to the provider for each of the residents, would be paid to the investors if the provider had to be replaced.
After approximately five years of presumably routine operation, an audit undertaken by the State revealed that the provider, NCDC, had seriously breached its agreements with the defendant and the DSS. The DSS retroactively disallowed substantial development costs and fees, including legal fees paid to Mr. Marcus' law firm, and ultimately entered into a settlement agreement in which NCDC was to repay the sum of $700,000. The homes were placed into receivership and the residents of both Monroe and Quinnipiac were transferred to new locations. As a result of the deterioration of the neighborhood, the New Haven homes were not reopened and ultimately, the plaintiffs converted them into traditional residential rental units. The Litchfield property was changed from an intermediate care facility operated by the DSS to a home similar to the prior status of Monroe and Quinnipiac.
Neither party truly disputes that investors such as the plaintiffs were sought to develop these homes. Nor is there any dispute that state agencies strictly reviewed all phases of licensing, development, and construction. At one point, the defendant required the provider-investor leases to run for a term often years to provide a stable environment for its clients. The ten year requirement also had the benefit of providing investors with a certain return on their investment which thus helped make the investment viable. Indeed, to some extent, there is no controversy as to whether representatives of the defendant or DSS made some of the statements. The issue is whether a contract was formed.
 II A.
In addition to its defense that it did not enter into a contract with the plaintiff, the defendant also claims that this action is barred by the doctrine of sovereign immunity. The plaintiff disputes this defense alleging that General Statutes § 19a-24[3] constitutes a waiver of sovereign immunity.
"It is well established that the state or a city is immune from suit unless it consents to be sued by appropriate legislation waiving sovereign immunity in certain prescribed cases. . . . Thus, in a case where a government is the defendant, courts do not have subject matter jurisdiction unless such jurisdiction is statutorily conferred. The legislature, however, has carved out certain statutory exceptions to the CT Page 4263 general rule of sovereign immunity and allowed governmental entities to be sued under certain limited circumstances." (Citation omitted; internal quotation marks omitted.) Brennan v. Fairfield, 58 Conn. App. 191,753 A.2d 396, appeal granted in part on other grounds, 254 Conn. 903,755 A.2d 217 (2000).
In Duguay v. Hopkins, 191 Conn. 222, 229, 464 A.2d 45 (1983), the court rejected a sovereign immunity claim finding that "[t]here are no words, phrases or clauses in 19a-24 limiting or restricting the scope of `any civil action for damages.' If the legislature wished to restrict the statute to some civil actions against the named commissioners, it could have done so. If this were the legislative intent, it has failed to express it." The defendant claims that the ruling in this case is limited to tort actions only and does not include contract actions as the phrase "act or omission" has been utilized by the legislature in other statutes to refer to tortious conduct. In Duguay, the court concluded, "19a-24 was intended by the legislature to apply to all civil actions against the commissioner of health and the commissioner of mental retardation or any member of their staffs. By its enactment the legislature has waived the sovereign immunity of the state in those cases to which the statute applies." In light of our Supreme Court's ruling in Duguay, this court rejects the defendant's argument.
 B.
The plaintiffs claim that the defendant has breached its oral contract to supply tenants and state rental payments for the subject properties for a period of ten years. However, for a number of reasons this court is unable to conclude that a contract ever existed.
First, there is a real question concerning the identities of the parties. "The rule that there must be a meeting of the minds to form a contract involves a common understanding of the identities of the parties." See Ubysz v. DiPietro, 185 Conn. 47, 51, 440 A.2d 830 (1981). Mr. Marcus testified that he had certain conversations with different individuals but he never testified that he told the representatives that he was representing a specific entity — only unnamed investors. Additionally, he indicated that the contract came into existence in the first quarter of 1989, and at that time, the only possible partnership that the discussions could have pertained to was the partnership for Monroe Street, with Mr. Gaynor and others, which was formed on April 7, 1989. The partnerships concerning the other two properties were not to come into existence for some time: Quinnipiac in October 1990, and Litchfield in December 1991. Certainly the conversations with Attorney General Riddle in 1988 were well before the existence of the partnerships and cannot be said to have been with identified parties. Even the one CT Page 4264 letter written to Assistant Attorney General Menchel in February 1990, (after the claimed formation of the contract) does not identify any specific entity.
Assuming that the Gaynor/111 Whitney Avenue partnership was in existence at the time of the discussions, the plaintiff must next prove that there was a meeting of the minds between the parties. As noted by the defendant during trial, the only member of the DMR that Mr. Marcus or Mr. Gaynor spoke to during that first quarter was Antoinette Richardson. Mr. Dune, an employee of DIM certainly could not, without proof not provided in this case, speak for DMR. Ms. Richardson, however, does not recall this meeting and despite having written documentation for other meetings, the plaintiffs have no written memoranda for this meeting. Moreover, Ms. Richardson was not the Regional Director for the New Haven area. Her authority concerned Region One — a part of the state which included Naugatuck where one of Mr. Marcus' partnerships was developing a home — but not New Haven. Nevertheless, what she does recall, is that in all of her discussions with individuals, she said there were no guarantees. Her statement is, in fact, partly confirmed in Mr. Marcus' February 2, 1990, letter to Assistant Attorney General Menchel in which he acknowledges that the state is not a guarantor of the lease between the landlord and the provider. The fact that Mr. Marcus and Mr. Gaynor reached what they called a "comfort level" because they heard that the defendant wanted long term arrangements for their clients and that the lease terms for at least some of the facilities were ten years, does not translate into specific terms of a contract between the defendant and the plaintiffs. See Suffield Dev. Associates Ltd Partnershv. Society for Savings, 243 Conn. 832, 843, 708 A.2d 1361 (1998) citingWestbrook v. Times-Star Co., 122 Conn. 473, 481, 199 A. 91 (1937) ("where `the memorandum appears [to be] no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms,' the plaintiff has failed to prove the existence of an agreement.")
The claim in this case is not unlike the claim of the existence of an oral subordination agreement in LR Realty v. Connecticut NationalBank, 53 Conn. App. 524, 732 A.2d 181 (1999). The Appellate Court rejected the argument and reviewed the requirement for a meeting of the minds in the formation of a contract: "To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. . . . If the minds of the parties have not truly met, no enforceable contract exists." (Citations omitted; internal quotation marks omitted.) Id., 534. By design there was no direct CT Page 4265 contract between the plaintiffs and the defendant. The plaintiffs were well aware that the DMR contracted with a provider and that the provider then entered into whatever leasing arrangements, albeit subject to the defendant's as well as the DIM's review, with the plaintiffs. Needless to say, there is of course no privity between the plaintiffs and the defendant. The plaintiffs knew that the defendant's contract with the provider was for a term of one year with the ability to terminate. An allegation that the DMR promised to provide tenants for ten years without more does not make a contract.
Inexorably intertwined with the requirement that there be a meeting of the minds is the requirement that the representatives on each side have the authority to bind their respective party. See generally S. Williston, Contracts (4th Ed. 1999) § 35:63. This court received a stipulation of facts regarding testimony of Brian Lensink, the Commissioner of the defendant, indicating that he never met or spoke with any person connected to the plaintiffs, that all contracts with the defendant had to be in writing signed by him or his designee, and that he never authorized the entering into a contract, oral or written, with any of the plaintiffs or their representatives. Ms. Richardson testified that she never authorized any oral contacts when she became Commissioner in 1990, and more importantly, that she was not authorized to enter into any oral contracts while she was Regional Director of Region One.
In Norwalk v. Board of Labor Relations, 206 Conn. 449, 451, 538 A.2d 694
(1988), our Supreme Court discussed the concept of apparent authority and stated, "The rules that govern the determination of apparent authority in an agent require an examination of the acts of the principal, rather than of the agent. . . . Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . The parameters of this doctrine, however, are sharply circumscribed when the principal is a municipal corporation." (Citations omitted; internal quotation marks omitted.) The court went on to add, "[t]he defendant union is charged as a matter of law with knowledge of the prescribed mechanism by which the police commission may . . . bind the city to its actions. [E]very person who deals with [a municipal corporation] is bound to know the extent of its authority and the limitations of its powers . . ." (Citation omitted; internal quotation marks omitted). Id., 453. This rule applies equally to other branches of the government. See, Gay Street Corp of Baltimore,Maryland v. U.S., 127 F. Sup. 585, 589 (1955) ("anyone entering into an agreement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.") See also S. Williston, Contracts (4th
Ed. 1999) § 35:63. Furthermore, "The principal is not bound when it appears, from the circumstances of the transaction, that the third person CT Page 4266 knows or should know the limitation of the agent's authority. . . ." S. Williston, Contracts (4th Ed. 1999) § 35:20, p. 259.
As noted by the defendant, Edward Marcus was certainly not a novice in the field of contracts. He was an experienced investor, a long standing member of the Bar and a State Senator for some twelve years. His involvement in the alleged discussions was both personal and professional since he was both an investor and counsel for the many partnerships. While there is no dispute that Mr. Marcus and Mr. Gaynor had conversations with some state employees over some period of time, there was no testimony that the Commissioner either directly or indirectly did anything that could be construed as allowing his employees to enter into contracts on his behalf. Moreover, it is hard for this court to believe that with all his experience, Edward Marcus, in both of his capacities, could reasonably believe that the state employees he spoke with could, under such an informal arrangement, bind their principle in an oral contract. See Tomlinson v. Board of Education, 226 Conn. 704, 734-35,699 A.2d 333 (1993).
Ultimately, when we sift through the evidence, there is only the claim of one conversation with Antoinette Richardson in the first quarter of 1989. Notwithstanding the fact that she had no authority for New Haven, this allegation conflicts with her testimony as well as that of her Commissioner.
 C.
Finally, the defendant maintains that the statute of frauds requires that this action must fail. General Statutes § 52-550 states, in part: "(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof. . . ."
"The primary purpose of the statute of frauds is to provide reliable evidence of the existence and the terms of the contract." (Internal quotation marks omitted.) Jacobs v. Thomas, 26 Conn. App. 305, 310,600 A.2d 1378 (1991), cert. denied, 221 Conn. 914, 603 A.2d 404 (1992), quoting Heyman v. CBS, Inc., 178 Conn. 215, 221, 423 A.2d 887 (1979). "The function of the statute is evidentiary, to prevent enforcement through fraud or perjury of contracts never in fact made." Lynch v.Davis, 181 Conn. 434, 440-41, 435 A.2d 977 (1980). "The Statute was also designed to prevent the enforcement of unfounded fraudulent claims by requiring written evidence . . . and to prevent fraud by requiring CT Page 4267 certain enumerated contracts to be evidenced in writing." S. Williston, Contracts (4th Ed. 1999) § 21:1, p. 171-72. "In order to satisfy the statute of frauds, an agreement must state the contract with such certainty that its essentials can be known from the memorandum itself, without the aid of parol proof, or from a reference contained therein to some other writing or thing certain; and these essentials must at least consist of the subject of the sale, the terms of it and the parties to it, so as to furnish evidence of a complete agreement." Carta v. Marino,13 Conn. App. 677, 680, 538 A.2d 1091 (1988), citing Montanaro v.Pandolfini, 148 Conn. 153, 157, 168 A.2d 550 (1961).
This case is one in which the purpose of the statute of frauds is best exemplified — the need for reliable evidence concerning the existence and actual terms of a contract at issue. The alleged agreement not only concerns real property, but also is not to be performed within one year.
The plaintiffs seek to circumvent compliance with the statute of frauds by relying on an exception: that the contract has been fully performed. The plaintiffs argue that they were only obligated to provide the capital to develop the homes and as they have done so, the statute does not apply. "Full performance by one party to a contract takes it out of the [Statute of Frauds]." Stanley v. M.H. Rhodes, Inc., 140 Conn. 689, 695,103 A.2d 143 (1954). "[T]he rule, generally recognized, [is] that full performance by one party to an agreement removes it from the statute." (Citation omitted.) Burkle v. Superflow Mfg. Co., 137 Conn. 488, 498,78 A.2d 698 (1951). The plaintiff's argument, of course, presupposes the existence of a contract. As this court has determined that none of the requirements for the formation of a contract exists, it cannot find that there was an oral agreement between the parties. The doctrine of full performance does not apply to the facts of this case.
 III
For the above reasons, the court finds that no contract existed between the parties. Judgment enters for the defendant.
Berger, J.