**E. J. BURKE, Plaintiff in Error,**

**v.**

**Wilson THOMAS, Defendant in Error.**

**No. 37473.**

Supreme Court of Oklahoma.

June 25, 1957.

Roy Frye, Sr., Roy Frye, Jr., Sallisaw, for plaintiff in error.

J. Fred Green, Fred D. Green, W. S. Agent, Sallisaw, for defendant in error.

CORN, Vice Chief Justice.

Beginning the latter part of May, 1954, defendant instituted an aerial spraying project on his ranch in Sequoyah county for the purpose of ridding his land of unwanted growths. A qualified pilot with a specially equipped plane, and who held a state issued permit for such operations, was engaged to carry out this work. A deleterious chemical substance (245T) was mixed with water and diesel oil and sprayed over the land by the airplane while flying at low altitude. Generally, unwanted trees and undergrowth would be killed within approximately 60 days after being sprayed.

In carrying on the spraying the pilot was given maps of the area and shown the land to be sprayed. Local residents, hired by defendant's foreman and paid by defendant's checks, were employed as "flagmen" to assist in the operation. These employees' duties were to hold flags as markers to define the particular area to be covered by the pilot. The time and place of the actual spraying was left to the pilot's discretion, and he instructed the flagmen where to place the flags in order to define the area to be sprayed.

July 21, 1954 the plaintiff filed this action (case No. 11833) to recover damages for injury to his land, destruction of growing crops, and for punitive damages. On the same date four similar cases (Nos. 11829–11830–11831–11832) were filed by other land owners in the area.

Plaintiff's claim for damages was predicated upon the alleged unlawful, malicious, careless and negligent acts of defendant's agents and employees in spraying plaintiff's property with a poisonous substance, which killed the shade trees, grape vines, lawn grass, pasture and 5 acres of standing timber. The petition asked judgment for the different items of damage in the total amount of $3,675.

Defendant answered by general denial. Trial of the issues to a jury resulted in a verdict assessing plaintiff's damages at $800, upon which verdict the judgment appealed from was rendered. The matters urged as grounds for reversal require summation of the evidence upon which the jury's findings were based.

The plaintiff owned 7½ acres of land adjoining defendant's ranch; he had constructed a 2 room house thereon, surrounded by about 20 shade trees and about ¼ acre of a lawn composed of wild grass. There were 10 wild grape vines on the property at the time of purchase, and some years these bore one or more bushels per vine; about ¼ an acre was devoted to gardening, and the remaining 5 acres was in timber, which also was considered pasture land. Plaintiff was away from home when spraying occurred, but upon returning home

2 weeks thereafter, found the tree foliage falling and by fall the trees were dead, and the garden was completely destroyed so the family derived no benefit therefrom, and the grape vines were dead; there was a good stand of wild grass in the pasture, but it all died after the spraying; some trees leafed out in the spring of 1955, but most of them were dead. Plaintiff placed a $3,000 valuation upon his property before the spraying, and only $1,000 thereafter. Over defendant's objections plaintiff was permitted to testify that the ¼ acre family vegetable garden was worth from $400 to $500.

Cross-examination established that his land was rolling and rocky and there was an old house, grape vines and timber on the land when plaintiff purchased the property for $150; thereafter plaintiff built a two room house of native lumber and asphalt covering; the grape vines were not cultivated or fertilized, and the fruit was not sold; some fertilizer had been used for the potatoes, but his wife planted the garden, most of which was just coming up when spraying occurred.

Three witnesses testified in plaintiff's behalf. One (Brown) worked for defendant as a flagman during spraying operations in May, 1954 (and was paid by check drawn on defendant); he saw the airplane over plaintiff's property, but did not know whether the pilot was spraying at the time; witness' duty was to hold up a flag to direct the pilot and was about the middle of the group; the plane went past him approximately ½ mile before turning, but he did not know whether the spray was turned off when the plane went over plaintiff's land, but it went over the land more than one time; once the witness left his position and went to defendant's foreman to advise him the pilot was missing the area supposed to be sprayed.

Another witness (McKenzie) lived a half-mile from plaintiff, and also had an action pending on the same docket to recover damages for spraying of his own property; he had seen the property before the spraying; after the spraying occurred the grass

turned brown, the garden had wilted down and later died; the shade trees lost their foliage and about 75% of the timber was killed. He estimated the original fair market value from $2,500–$3,000, and fixed the value thereafter at $800.

On cross-examination the witness stated the year 1954 was the driest in his 11 years experience, and most of the gardens died of the drouth that year; he fixed the value of the shade trees at $50 each, based upon experience as an ornamental tree surgeon, and knowledge that it would take from 18 to 25 years to grow such shade trees; the usual timbered land in that vicinity ranged in price from $3–$10 per acre. There had been fair rainfall in the spring, but the serious drouth began in June.

At this stage of the trial the parties stipulated the mixture used in the spraying was such as was intended to kill trees and shrubs on defendant's property.

Another witness (Hardin) who also had an action for damages pending on the docket, lived next door, was familiar with plaintiff's property prior to May 27, 1954, although he had not been in the garden.

His testimony was that 12 or 15 shade trees were dead, the grass was killed and only weeds grew thereafter; after spraying the garden looked as it would in the winter; the grape vines were dead, and 75% of the timber had been killed. He valued plaintiff's property at $2,000–$3,000 before the spraying and about $1,000 after the occurrence.

On cross-examination this witness admitted he did not know land values in the vicinity, but judged plaintiff's property as he would for himself as a home; could not valuate the house, but estimated cost of building at $300–$400, and set the value of the land and timber at $1,500–$2,500. The witness had not seen plaintiff's grass until nearly Christmas, but thought it must have been sprayed or it would have come up the next year; had the same belief as to the pasture; did not know whether grass had not been sprayed or died during 1954.

At the close of plaintiff's evidence the trial court sustained defendant's motion to strike the allegation as to punitive damage, no evidence having been presented requiring submission of such issue to the jury. Defendant's demurrer to plaintiff's evidence was overruled.

Defendant, a resident of the state of Texas, testified in his own behalf by deposition, principally directed toward attempting to establish that the pilot was not in defendant's employ; and that the alleged injuries in reality resulted from a drouth in the summer of 1954. Defendant testified the plane was owned by E. J. Burke Lumber Company, a Texas Corporation, and was flown by an employee of the company; the company charged the expense to defendant; the agreement was that the pilot was not to be directed when or where to spray, and neither defendant nor his employees laid out the route to be flown or gave him directions, but only furnished maps and showed him the land to be sprayed; the pilot decided upon the route to be flown and instructed the flagmen, defendant's employees, what they should do. The year 1954 was very dry in that vicinity and defendant lost a great number of trees on his ranch in unsprayed areas; he saw plaintiff's property after June, 1954 but saw no indication of spray damage. Plaintiff had offered to sell his property for $800 but defendant considered the price too high; the land being mountainous with timber of little value, and having an average value of $5 per acre. This type of land with timber removed was worth several times this amount because the grass would grow. The evidence relative to land values and the extent of the drouth in 1954 was corroborated by a defense witness (Cozart) who was in ranching and real estate business and knew the location of plaintiff's land. This witness testified the land was worth more for ranching purposes with the timber removed.

Two witnesses for defendant were graduates of the state agricultural college. Both had extensive experience in soil conservation work and were familiar with soil and

agricultural problems, as well as chemical means used in killing timber and brush. One witness (Griner) had visited plaintiff's property in October, 1954, to appraise the aerial spray damage, and had re-appraised the property in May, 1955. The substance of his testimony was: One chemical application would not kill a high percentage of the trees; 20 oak shade trees showed 50 percent damage and 10 percent killed, but in May, 1955 found a higher degree of recovery than expected. He observed a garden, approximately 30 feet by 70 feet, in shallow, rocky, medium texture soil considered undesirable for garden purposes, and the only vegetation was a grassy type, no spray damage was observable. There were mature wild grape vines killed by spraying; the native lawn grass was dead, but in his opinion had died from severe drouth condition in the area; there was no aerial spray damage in the pasture; the five acres of hardwood timber showed 40 percent damage and 10 percent kill. The timber was worth $10 per acre, but had based his calculations upon $75 figure claimed by plaintiff. The entire tract had been examined and the grape vines had been valued at $5, or a total of $50, but if the petition claimed $50 per vine this damage would be $500, although witness considered the valuation per vine too high, and thought $20 per vine would be a good price. Nothing was allowed for the percentage of damage to the shade trees. The total estimate of damage amounted to $20 for timber and $500 for grape vines, calculated upon the basis of percentage killed measured by the valuation claimed by plaintiff.

The other witness (Woodard) had visited plaintiff's place September 24, 1954 to appraise aerial spray damage. The shade trees claimed to have been damaged were post oak, blackjack and hickory trees varying from four inches to nine inches in diameter, and it appeared that 50 percent were dead for which he estimated $60 loss because they were shade trees. The 30 by 70 foot garden area was in soil not desirable for gardening purposes, and showed little expenditure of effort to produce a

garden in 1954; there was no garden residue to examine to determine whether killed by chemical application; the pasture was native grass which chemical spray would not kill; there were a few scattered, dead trees damaged by spray and upon a basis of 20 percent damage, of which 10 percent resulted from chemical spray, damage to the timber was estimated at $15. This witness actually counted the shade trees killed, but thought most of the trees died from causes other than chemical application; he was unable to determine whether the garden had been damaged by spraying. The witness estimated that plaintiff had suffered a total of $135 damages to his property as a result of the aerial spraying.

Defendant's motion, at the conclusion of the testimony, that the jury be permitted to view the site of the alleged damage, was overruled. Defendant then submitted a written request for an instruction presenting the theory of defense that defendant had contracted with E. J. Burke Lumber Company to perform the aerial spraying and, if the jury found the facts to be as disclosed by defendant's evidence then the company was an independent contractor and defendant would not be liable for the negligence or damage resulting from such contractor's services and the verdict should be for defendant. The requested instruction was refused, and the trial court then gave oral instructions to the jury, including the following:

> "If you find from the evidence, by the fair preponderance thereof, that the pilot of the airplane doing the spraying for Burke flew over the plaintiff, Thomas' land and sprayed the same, thereby causing him any injury or damage, it will be your duty to find in favor of the plaintiff and fix his damages in whatever sum you find he had been injured on account of said fact."

The assignments of error relied upon as grounds for reversal of the judgment are under five propositions. The matter was submitted to the jury, and a verdict was

returned for plaintiff, fixing $800 as the amount of his damages. Judgment was entered against defendant for this amount.

The assignments of error urged as grounds for reversal of this judgment are presented under five propositions, the first of which asserts the trial court erred in overruling defendant's demurrer to plaintiff's evidence. The argument is that the evidence failed to establish who actually did the spraying, there being nothing to connect the defendant with the work done. The argument is without substantial merit. The evidence clearly disclosed that men, hired by defendant's foreman and paid by checks drawn on defendant, actively assisted the pilot in carrying out the spraying of a substance which, by stipulation, was shown as being intended to kill timber and undergrowth on defendant's land; and, during the actual spraying one of defendant's employees left his post to see the foreman and advise him the pilot was flying over plaintiff's property.

■ The necessary import of such evidence could only be that a plane authorized to spray defendant's property and assisted in the work by other agents, servants or employees, flew over and sprayed upon plaintiff's property a substance calculated to kill unwanted growth upon defendant's land. Defendant's demurrer admitted the truth of every fact the evidence tended to prove in the slightest degree, as well as all inferences logically and reasonably to be drawn therefrom. McReynolds v. Oklahoma Turnpike Authority, Okl., 291 P.2d 341. And, a demurrer to the evidence cannot be sustained unless there is an entire absence of proof tending to establish plaintiff's right to recover. Oklahoma Ry. Co. v. Hankins, 207 Okl. 374, 249 P.2d 997; Cooke v. Townley, Okl., 265 P.2d 1108; City of Ardmore v. Stuchul, Okl., 294 P.2d 308. The trial court was correct in overruling the demurrer to plaintiff's evidence.

Defendant next contends the trial court erred in refusing to give defendant's requested written instruction, and in giving the jury an oral instruction relative to defendant's liability for the acts of the pilot in spraying plaintiff's land. The supporting argument related closely to that offered in support of proposition No. 1, is that: (1) Defendant's principal defense was that an independent contractor relationship existed herein; (2) the evidence was sufficient to support such defense; (3) a party is entitled to have his theory of the case submitted to the jury where there is evidence in support thereof. Defendant insists the evidence not only failed to show the pilot was defendant's employee, but that the undisputed evidence disclosed the project was carried out by the corporation's employee without defendant, or his employees having any control over or voice in the matter.

■ Defendant acknowledged the rule that where evidence is undisputed the question, as to relationship of the parties, is one of law for the court. See Cook v. Knox, Okl., 273 P.2d 865. But, where the evidence is conflicting (upon such matters as the employee's right to direct and control details of the work) the question whether the relationship is that of employer and employee or independent contractor is for the jury's determination. See Modern Motors v. Elkins, 189 Okl. 134, 113 P.2d 969.

■ As defendant points out, on hearing motion for new trial, the trial court gave an unsound reason for refusing the requested instruction on defendant's theory of independent contractor. The court stated that:

"* * * the giving of such instruction would have disqualified the jury in all the balance of the cases and made it necessary to string these cases out over a period of more than four years of trial."

The length of time consumed in the trial of cases cannot provide a justifiable basis for denying litigants the right to assert fundamental defenses.

■■ We are of the opinion, however, that no prejudicial error resulted from the trial court's refusal to give the requested instruction, and in giving the oral instruc-

tion above quoted. In 27 Am.Jur., Independent Contractors, Sec. 38, the following rule is found:

"It is well settled that one who orders work to be executed, from which, in the natural course of things, injurious consequences must be expected to arise unless means are adopted by which such consequences may be prevented, is bound to see that necessary steps are taken to prevent the mischief, and such person cannot relieve himself of his responsibility by employing someone else, whether the contractor employed to do the work from which the danger arises or some third person, to do what is necessary to prevent the work from becoming wrongful. This rule is sufficiently comprehensive to embrace, not only work which, from its descriptions, is 'inherently' or 'intrinsically dangerous', but also work which will, in the ordinary course of events, occasion injury to others if certain precautions are omitted, but which may, as a general rule, be executed with safety if those precautions are adopted. * * *"

Recognition and application of the rule by this court may be noted in Oklahoma City v. Caple, 187 Okl. 600, 105 P.2d 209, and earlier cases therein cited. Also see Annotations, 23 A.L.R. 1085 and 33 A.L.R.2d 95.

Clearly the spraying project, whether carried on by defendant's employee or by an independent contractor, was such an operation that from its very nature injurious consequences could be expected to result unless means were adopted to avoid those consequences. Under the circumstances we need not decide at this time whether an aerial spray operation, such as this is, in itself, inherently dangerous. We are of the opinion and hold that, based upon the rule stated above, no error resulted from the trial court's refusal to submit for the jury's consideration the requested written instruction asserting the defensive theory of independent contractor.

■■ Defendant next contends the trial court erred in refusing defendant's request for the jury to be permitted to view the premises where the alleged damages occurred. This case was being tried in the late fall (November 28, 1955), approximately seventeen months after the alleged injury occurred. The seasonal changes obviously would have caused vegetation and foliage on the trees to present an entirely different appearance. The trial court noted this, together with the fact the jurors generally were familiar with the character of the land and timber involved, in denying the request. Whether a jury shall be permitted to view the premises involved in an action is discretionary with the trial court. Denver Producing & Refining Co. v. Meeker, 199 Okl. 588, 188 P.2d 858. The length of time elapsed between the alleged injury and the time of the trial, the difference in the season of the year and the jurors' familiarity with the locality, all were considered by the trial court in denying defendant's motion. The circumstances do not disclose an abuse of discretion by the trial court.

The two remaining propositions are directed at the sufficiency of the evidence to support a judgment in the amount found by the jury; and at the error of law committed in allowing introduction of improper testimony and thereafter giving an erroneous instruction as to the measure of damages to be applied to a particular item of damages. Since both are based upon the evidence introduced in trial of the case they may be combined for consideration.

The petition alleges six separate items of damages (exclusive of the claim for punitive damages) totaling $3,175. Defendant's position is that the original value of plaintiff's property, compared with the valuation placed upon the entire property after the spraying, reflects the gross excessiveness of the verdict returned by the jury. Defendant's argument is that the verdict and judgment can only be considered as grossly excessive and the result of bias and prejudice, when the amount of damages found by the jury is considered in the light of evidence disclosing the average value of this type of land, the price paid

originally by plaintiff and the slight extent of the improvements. And, defendant insists this is especially true when measured by the expert testimony which established the modest value of the property before the spraying, the slight nature and extent of damage by spraying, and the relatively small amount of actual damages which resulted.

With the exception of the item of damages to the garden, discussed hereafter, no satisfactory reason appears to justify interfering with the jury's verdict. It may be conceded the amount of damages allowed plaintiff was most liberal in some respects.

■ It must be noted, however, that the amount of the verdict was well within the permissible limits reflected by the evidence adduced by plaintiff. And, further, the rule is that the weight to be given to expert testimony is for the jury, and it is not required that controlling influence be given to opinions of expert witnesses. See Midland Valley Ry. Co. v. Lowery, 207 Okl. 227, 248 P.2d 1042.

■ We are however, of the opinion the error in the admission of certain evidence, and the instruction upon the measure of damages to be applied under such evidence, necessitates serious consideration. During the course of plaintiff's testimony the trial court permitted him to testify the family garden was worth $400–$500 per year. This testimony was permitted over defendant's urgent objection that such evidence was improper to show the measure of damages. However, the court stated he thought the measure of damage would be the value of the garden to plaintiff and his family, and such item could not be limited to the market value at the time of loss.

The trial court attempted to instruct the jury orally upon the issues in the case, generally stating the nature of the case and that plaintiff sought recovery of $3,175 total damages to his property. No effort was made to call the jury's attention to the different items of damage claimed. The form and nature of the instructions clearly reflect the danger inherent in an oral attempt to instruct a jury adequately upon the fundamental issues in a jury case. The defendant excepted to the oral instruction relating to the relationship between defendant and the pilot; and to the portion of the instruction dealing with the measure of damages to the garden that:

"As to the measure of damages for destruction of the garden the measure of damage is the value in money to the plaintiff, Thomas, for the garden which, of course, would be less any cost or expense or labor involved in cultivating the garden and bringing it to a condition of being fruitful or productive. * * *"

■ The general verdict, returned under the court's instructions, does not disclose the amounts which the jury allowed for the different items of damage claimed. The failure of plaintiff's evidence to establish the elements necessary for determining the amount of money damages incurred from the loss of the garden is so apparent as not to require comment. The instruction, based solely upon testimony as to plaintiff's conception of the value of the garden, discloses a basic misconception of the proper rule of damages to be applied. The different kinds of vegetables planted in the garden were common varieties which bear an annual crop. By plaintiff's own testimony the garden was just coming up, and had produced nothing at the time the spraying occurred. In Crow v. Davidson, 186 Okl. 84, 96 P.2d 70, 126 A.L.R. 123, following the rule in earlier decisions, the applicable rule as to the measure of damages to be applied for destruction of growing crops was stated as follows:

"In an action for damages for injury to growing crops, the measure of damages is the value of the unmatured crops at the time of the injury. In arriving at such value, it is proper to show by evidence the probable yield under proper cultivation, and the value of such probable yield when matured, gathered, prepared, and ready for sale; also the probable cost of proper culti-

vation necessary to mature the crop, as well as the cost of gathering, preparation, and transportation to market. The difference between such probable value in the market and the cost of finishing the cultivation, and gathering, preparing and transportation to market, will represent the value at the time of loss."

This rule later was applied in Franklin Drlg. Co. v. Jackson, 202 Okl. 687, 217 P.2d 816, 19 A.L.R.2d 1015. Again, in Chicago, R. I. & P. Ry. Co. v. Turner, Okl., 243 P.2d 673, we had occasion to point out that the measure of damages for loss of an annual crop is the value at the time of the destruction.

The plaintiff alleged $300 damage resulted from loss of his garden. None of the above enumerated elements tending to establish the amount of the loss were covered by the evidence, but plaintiff was permitted to fix the amount of loss at from $400-$500, as constituting the annual value of this half acre garden to himself and his family. The trial court advised the jury to apply an erroneous measure of damages in determining the amount of loss for this item, without charging the jury that $300 was the limit to be allowed. Thus the jury was permitted to assess damages improperly and without evidence to support their calculations. It must be assumed the general verdict included an amount for the claimed loss. Under the instruction given the jury could have fixed this amount within the limits of plaintiff's testimony, although such evidence was not proper to establish value. Clearly this portion of the verdict cannot be permitted to stand.

The judgment is affirmed, upon the condition plaintiff file a remittitur in the amount of $400, otherwise the judgment is reversed and the case remanded for new trial.

HALLEY, JOHNSON, WILLIAMS, JACKSON and CARLILE, JJ., concur.

DAVISON and BLACKBIRD, JJ., concur in result.