[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case involves damage to shellfish beds in Long Island Sound off Milford. The plaintiffs, Tallmadge Brothers, Inc. (Tallmadge) and Robert J. Sabo d/b/a Milford Oyster Farm and Coastal Oyster Farms, Inc. (Sabo), lease a large amount of acreage where they cultivate and harvest oysters and clams. CT Page 8639 The defendant, Iroquois Gas Transmission System, L.P., constructed a natural gas pipeline from the Connecticut shore at Milford, across the Sound to Long Island, during the spring and summer of 1991.
In the first and fifth counts of their amended complaint of March 5, 1993, the plaintiffs allege that the defendant advised them that construction would take place in an area 100 feet on either side of the pipeline; that the defendant proposed and the plaintiffs accepted a formula for compensation for damages to the shellfish beds and entered into a "Full and Final Settlement Agreement," dated on or about March 1, 1992; that the defendant's work corridor was in fact 300 feet wide; that the defendant's representation about the width of the work area was false, the plaintiffs relied on such representation and only agreed to the formula for compensation because of that representation. In the second and sixth counts of the complaint, the plaintiffs complain that the defendant breached its agreement to work within a corridor 200 feet wide. The plaintiffs allege in the third and seventh counts that the defendant's conduct violated General Statutes § 42-110a, et seq., the Connecticut Unfair Trade Practices Act (CUTPA). In the fourth and eighth counts, the plaintiffs allege that the defendant committed a trespass on their property. The ninth and tenth counts claim that the representations about the width of the work corridor were negligently made by the defendant. The plaintiffs seek monetary damages plus punitive damages and attorney's fees under CUTPA, and for fraud and trespass.
The defendant denied the material allegations of the complaint except it admitted that: (1) the plaintiff Tallmadge held a perpetual franchise for the seeding, cultivation and harvesting of shellfish in Long Island Sound off Milford; (2) Sabo had a lease from an owner or lessee of a franchise in the same area; (3) the plaintiffs were advised that the most severe impact on the shellfish beds would be within 100 feet of the pipeline and that there would be some "incidental" damage outside of this corridor; and (4) it did perform construction work outside a 200 foot corridor and that its construction contract refers to a 300 foot work area.
The defendant also filed special defenses alleging that: (1) by signing a "Full and Final Settlement Agreement" the plaintiffs waived any right to further compensation; (2) the plaintiffs had agreed to accept certain sums as "liquidated damages" in full CT Page 8640 settlement of their respective claims; and (3) the plaintiffs, who were seeking rescission of the settlement agreement, never returned the money that they received from the defendant as compensation for loss related to the construction of the pipeline.
The defendant also filed a counterclaim with five counts. In the first count, the defendant claims that it reached an agreement for compensation with the plaintiffs containing a liquidated damage clause; the plaintiffs agreed that they would release the defendant from any liability for further damages; and the plaintiffs have breached their agreement with the defendant by instituting the present action. In the second count, the defendant alleges that the plaintiffs committed fraud by misrepresenting and exaggerating the extent of their oyster beds and the anticipated damages to those beds; that because of these misrepresentations the defendant paid $5,199,998 to the plaintiffs, which is substantially greater in amount than it would have paid under eminent domain. In the third count, the defendant claims that the plaintiffs violated CUTPA by agreeing to liquidated damages and then commencing a suit for additional compensation. In the fourth and fifth counts, the defendant seeks restitution of the $3,661,536 paid to Tallmadge and $1,538,462 paid to Sabo, rescission of the settlement agreement, and authorization to commence eminent domain proceedings pursuant to General Statutes § 16-266.[1]
On March 5, 1996, the parties agreed that the case would be submitted to a committee as authorized by General Statutes §52-425.[2] They further agreed that the committee would be Nicholas A. Cioffi[3], who would hear the evidence and "report[ing] the facts to the Court." The committee also would make a "recommendation to the Court as to the conclusions of law to be applied thereto," all in accordance with "Chapter 10 of the Connecticut Practice Book" which pertains to procedures for civil trials.
The committee conducted a trial[4] and then issued "findings" and a"suggested opinion" in accordance with Practice Book (1998 Rev.) § 19-8. The committee found the following facts: (1) at a meeting of all interested parties in December of 1990, the defendant represented, and the plaintiffs agreed and understood, that the pipeline would be constructed in a 200 foot corridor, that all the shellfish within that area would be destroyed, and that there would be some "incidental" damage CT Page 8641 beyond the 200 foot zone from siltation, anchors and cables, but not direct construction damage; (2) the construction contract between the defendant and its contractor defines the "work area" as a 300 foot wide work corridor and the defendant sent a plan to the Connecticut Siting Council indicating the same 300 foot wide work area or corridor; (3) the parties met again in January of 1991, at which time the plaintiffs were advised by the defendant that the construction area would be 100 feet either side of the pipeline and that the shellfish in 20.66 acres of Tallmadge's property and in 9.8 acres of Sabo's property would be destroyed; (4) the permit issued to the defendant by the state Department of Environmental Protection (DEP) provided, among other things, that the defendant would "financially reimburse leaseholders for full market value of the resource impacted to satisfaction of shellfish bed leaseholders;" (5) the agreement, which permits the defendant to enter upon the property leased by the plaintiffs and refers to a 200 foot wide corridor,[5] was signed by the parties on or about March 1, 1991, and the plaintiffs received the compensation called for in the agreement, viz., $3,461,536 for Tallmadge and $1,538,462 for Sabo; (6) the parties intended that the compensation agreed to in the settlement agreement and paid to the plaintiffs be related solely to destruction of shellfish within the 200 foot wide work area and "incidental" damages beyond the 200 foot corridor, but not direct construction damages beyond 200 feet, which is what occurred; (7) the defendant's contractor dragged a steel leveling beam along the bottom of the Sound over an area wider than the proposed construction zone of 200 feet, and the plaintiffs then learned for the first time that the work area was 300 feet wide according to the contract between the defendant and its contractor; (8) dragging the leveling beam destroyed all the shellfish contained in 27.3 acres of Tallmadge's oyster grounds and 77.5 acres of its clam grounds, all outside the 200 foot wide work area; (9) Tallmadge's lots averaged 1,500 bushels of oysters and 1,000 bushels of clams per acre; (10) the parties never contemplated or agreed in the contract that the defendant would drag a steel beam across an area much wider than the proposed 200 foot work corridor; (11) Tallmadge entered into an "Assignment and Acknowledgment Agreement" in 1992 with the state regarding restoration of the oyster grounds after construction had been completed; and (12) the "gross market price" at the dock for oysters was $55 a bushel, and $67.50 for clams, and the "profit" for harvested oysters for Tallmadge was $12.50 per bushel and was $8.00 for Sabo.
The committee, on its own motion, opened the trial to receive CT Page 8642 new evidence regarding loss of Tallmadge's clams, including receipts and profits.[6] As a result of the new evidence, the committee found that the "profit" for Tallmadge on clams was $4.50 a bushel.
The committee concluded that: (1) the written agreement of March 1, 1991 did not contain "the entire understanding or the intention of the parties" because the agreement omitted to provide that the work or construction area would be confined within an area of 100 feet on either side of the pipeline; (2) the defendant committed a trespass and breached the contract with the plaintiffs because it dragged a heavy steel beam along the bottom of the Sound outside the 200 foot corridor, thereby destroying 3.2 acres of Tallmadge's oysters and 54.9 acres of its clams, and 1.92 acres of oysters owned by Sabo; (3) the defendant, in effect, "roam[ed] the beds in a care-free destructive manner;" (4) the proper measure of damages is the selling price of the oysters and clams at the dock, "less the associated cost of bringing the crops to market," which the committee subsequently labeled or defined as "profit;" (5) the March, 1992, settlement agreement ratified the obligations of the parties regarding restoration of the shellfish beds and did not act as a release of the defendant from liability for damage sustained outside the 200 foot wide work corridor; (6) insufficient evidence was offered to sustain the claims of the plaintiffs for CUTPA damages, punitive damages for fraud or for trespass, or with respect to the counterclaim of the defendant; and (7) the plaintiffs sustained damages by reason of the defendant's breach of contract and trespass in the amount of $60,000 for Tallmadge for oysters and $222,345 for clams, a total of $282,345, and $54,000 for Sabo for the destruction of his oysters, all based on the theory of lost profits.[7]
The plaintiffs, pursuant to Practice Book (1998 Rev.) § 19-12, moved to correct[8] the committee's report in a number of respects, which can be summarized as follows: (1) "profit" is not the proper method of calculating damages to the plaintiffs, but damages should be awarded on the market value of the oysters and clams, which would be the full wholesale price at the dock; (2) the defendant destroyed 27.3 acres of oyster beds and 77.5 acres of clams belonging to Tallmadge, and 4.5 acres of oysters belonging to Sabo, outside the 200 foot construction zone; (3) the defendant knew that its work corridor would be 300 feet wide but fraudulently misrepresented the width of the work area to the plaintiffs and thus, violated CUTPA, committed fraud and was guilty of an intentional trespass; (4) Tallmadge spent $1,380 per 800 bushels of oysters for harvesting and transporting to the CT Page 8643 dock; the cost for clams was $1,380 per day, consisting of $500 per day for the boat, $40 per hour for the captain, and $40 per hour for two crewmen; the cost for Sabo was $1,880 per day because it spend $1,000 for the boat; (5) Tallmadge was entitled to $7,637,014 compensatory damages, plus punitive damages and attorney's fees, and Sabo was entitled to recover $355,388, plus punitive damages and attorney's fees;[9] and (6) the defendant was collaterally estopped from relitigating the issue of damages because of Robstock v. Iroquois Gas Transmission System, L.P., Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 93-42236 (January 24, 1966.)
The committee issued "Amended Committee Findings" which denied the plaintiffs' motion to correct, except to note that the acreage belonging to Sabo that was destroyed was actually 4.5 acres instead of 1.92 acres. The committee then determined that Sabo was entitled to recover for 6,750 bushels at a profit of $8 per bushel, or $54,000.
The defendant also filed a motion to correct which can be summarized as follows: (1) in or about December, 1990, both Tallmadge and Sabo moved 28,000 and 40,000 bushels of their oysters, respectively, out of the work corridor before construction began, and hence the figure of 1,500 bushels per acre is exaggerated; (2) the settlement agreement unambiguously provides that it was in "full and final settlement of all damage claims," including damages outside of the 200 foot work area, and further provides that it could be amended only by an agreement in writing; (3) the plaintiffs never introduced evidence of their costs for harvesting and marketing their product, and the trial should not have been opened sua sponte by the committee to take evidence regarding the cost of harvesting clams; (4) the defendant's conduct in dragging a leveling beam outside the 200 foot work area did not constitute a trespass; (5) the Release executed by the plaintiffs was unambiguous and referred to all damage to the plaintiffs' property, not just within a 200 foot corridor; (6) the defendant proved its counterclaim; (7) the contractor for the defendant was not its "agent" but rather was an independent contractor; (8) the 1992 agreement ratified the settlement agreement and was executed with knowledge that the defendant's leveling beam was used outside the 200 foot wide corridor; and (9) both of the plaintiffs were overpaid in that Tallmadge received $3,461,536 and his actual damages, based on loss of profit, were $3,121,848; if based on gross sales price, Tallmadge was overpaid by $2,021,911 because CT Page 8644 he was damaged only in the amount of $1,429,625; Sabo was overpaid by $571,562 because his actual damages were $966,900 and he was paid $1,538,462, and if he is entitled to profits only, then he was overpaid $1,397,822.
The committee declined to change his report in response to the defendant's motion to correct except: (1) to note that the profit for Sabo for harvested oysters was $8.00 per bushel, not $8.50 as previously reported; and (2) to delete two lots from those originally enumerated as having 1,000 bushels of clams per acre.
In accordance with Practice Book (1998 Rev.) § 19-13, the plaintiffs then filed exceptions to the referee's report.[10]
These exceptions by the plaintiffs assert in essence the same claims set forth in their motion to correct.
The defendants also filed exceptions to the committee's report. These exceptions refer to the failure of the committee to delete or to add certain factual findings and conclusions, including claims of law made by the defendant, and also to certain evidentiary rulings by the committee, all as previously set forth in its motion to correct.
The plaintiffs filed objections to the committee's report as authorized by Practice Book (1998 Rev.) § 19-14.[11] The plaintiffs again contend that: (1) the measure of their damages should not be based on lost profits as recommended by the committee, $336,345; (2) the area destroyed by the defendant outside the 200 foot wide work corridor was 23.5 acres of oysters and 77.5 of clams for Tallmadge, and 4.5 acres of oysters belonging to Sabo; (3) the full market value or wholesale price of the shellfish destroyed was $2,252,250 of oysters and $5,231,250 of clams for a total of $7,483,500 for Tallmadge, and an additional $371,250 for Sabo, plus punitive damages and attorney's fees; (2) an "alternative" measure of damages could be based on market value of the shellfish "less the cost of bringing them to market." This method would amount to $2,181,611 for Tallmadge's oysters and $4,161,750 for its clams, or a total of $6,343,361. For Sabo, after deducting cost from fair market value, the result is $355,387; (5) the committee omitted lots #687 (11.8 acres) and #654 (12.3 acres) of oysters, and lots #653 (14.9 acres) and #686 (7.7 acres) of clams, all belonging to Tallmadge, from its calculation; (6) the committee should have awarded CUTPA damages because the defendant misrepresented that the width of the work area would be only 200 CT Page 8645 feet wide, and the defendant committed fraud and an intentional trespass which justified the imposition of common law punitive damages; and (7) the defendant is prevented by the doctrine of collateral estoppel from contesting the measure of damages because it litigated this same issue, albeit with a different plaintiff, in the Superior Court in Milford where it was decided that the plaintiff was entitled to full market value, without deducting for costs and overhead.[12]
The defendant also filed objections to the committee's report which contend that: (1) the settlement agreement is not ambiguous and explicitly states that it may be amended only by an agreement in writing and signed by both parties; (2) the settlement agreement recognizes that construction damages may take place outside the 200 foot work corridor; (3) the plaintiffs have been fully paid for all their damages in accordance with the settlement agreement; (4) the referee erroneously admitted parol evidence to vary or contradict the terms of an integrated and unambiguous agreement; (5) there was no trespass by anyone on the plaintiffs' property, but any such trespass as found by the committee was not performed by the defendant but rather by McDermott, who installed the pipeline as an independent contractor, not as an "agent;" (6) the proper measure of damages is not the full wholesale price of the oysters and clams that were destroyed but rather the cost of harvesting and marketing the shellfish must be factored in the damages; and (7) the committee should not, sua sponte, have opened the case to take additional evidence on October 22, 1996, relating to clams owned by Tallmadge, specifically the gross receipts and profits relating thereto.[13]
This court's scope of review of a report by an attorney referee or, in this case, a committee, was reiterated by the Supreme Court in Elgar v. Elgar, 238 Conn. 839, 679 A.2d 937
(1996). There, the court held that, "[a] reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of . . . attorney trial referees. See Practice Book § 443. . . . The factual findings of a [trial referee] on any issue are reversible only if they are clearly erroneous. . . . [A reviewing court] cannot retry the facts or pass upon the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the CT Page 8646 definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) Elgar v.Elgar, supra, 238 Conn. 848-49; see also Romano v. Derby,42 Conn. App. 624, 626, 681 A.2d 387 (1996) ("The trial court, as the reviewing authority, may render whatever judgment appropriately follows, as a matter of law, from the facts found by the attorney trial referee.").[14]
Thus, according to EIgar v. EIgar, supra, 238 Conn. 839, this court has two tasks to perform in reviewing a committee's report. The first task is to determine whether the "referee's findings of fact were supported by the evidence." Id., 845. The second task is to ascertain whether "the conclusions drawn therefrom were legally and logically correct." Id.; see also Romano v. Derby, supra, 42 Conn. App. 628.
The main issues in this case are legal in nature, not factual. They are: (1) whether the settlement agreement prohibits the plaintiffs from obtaining any additional monetary damages from the defendant; (2) if the answer is no, and the plaintiffs therefore are entitled to additional damages, then is the defendant collaterally estopped from contesting the measure of damages because of the Milford decision by Judge Curran; and (3) if the defendant is not estopped from relitigating this issue, then what is the proper measure of damages?
The defendant argues that the settlement agreement of March 1, 1991, is clear and unambiguous and that the committee's decision to supply a missing term in order to carry out the alleged intent of the parties is in error. The committee's determination that the parties, in formulating their settlement agreement, intended to refer to construction damages within the 200 foot wide work zone and "incidental" damages outside that area, but not to "direct construction damages" outside the zone is a factual one. Thus, the decision falls within the exclusive authority of the fact finder. The determination of the parties' contractual commitments is a question of the intention of the parties, and an inference of fact; Suffield DevelopmentAssociates v. Society for Savings, 243 Conn. 832, 852,708 A.2d 1361 (1998); unless the language is so "definitive" as to be a question of law. Pesino v. Atlantic Bank of New York,244 Conn. 85,92, 707 A.2d 540 (1998); Kalles v. Harnen, 48 Conn. App. 2 53,257, 709 A.2d 586, cert. denied, 244 Conn. 935, ___ A.2d ___ (1998). CT Page 8647
As stated in Foley v. Huntington Company, 42 Conn. App. 712,730-31, 682 A.2d 1026 (1996), "[t]he construction of a contract is usually a question of fact because the interpretation of its language is a search for the intent of the parties, making contractual intent a classic question of fact. A conclusion as to the intent of the parties must stand unless it is one that a trier could not reasonably reach."
"Where the fact finder's conclusions as to intent are based on such factors as the credibility of witnesses and the testimony of live witnesses as to the meaning of a contract or as to the circumstances surrounding the execution of a contract, a question of fact as to intent of the parties exists." Griffin v. Planning Zoning Commission, 30 Conn. App. 643, 650, 621 A.2d 1359
(1993). "The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence."Fortier v. Newington Group, Inc., 30 Conn. App. 505, 509,620 A.2d 1321 (1993). "What the parties intended to include in their [agreement] is a question of fact." Four D's, Inc. v. Mattera,25 Conn. App. 308, 312, 594 A.2d 484 (1991).
"To give meaning to contracts, courts interpret the intent of the parties by construing the whole contract and all relevant provisions together. . . . In construing contract terms, the court seeks to effectuate the intent of the parties. . . . To ascertain the parties' intent, the courts consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish. . . . The intent of the parties is normally a question of fact for the trier . . . which we will not disturb unless it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) Colby v. Burnham,31 Conn. App. 707, 714, 627 A.2d 457 (1993).
In addition, even if a "missing" term is not added to the March 1, 1991 settlement agreement in order to effect the "intent" of the parties, the plaintiffs are seeking compensation for direct construction damages outside this 200 foot wide work area. The court believes, therefore, that the settlement agreement is not applicable to this issue. Thus, the decision of the committee that the plaintiffs are entitled to additional compensation over and above the settlement agreement is accepted, although for a different reason. Whether one supplies a missing term to the settlement agreement, as recommended by the committee, or finds that the agreement is inapplicable for CT Page 8648 construction damages outside the 200 foot kill zone, the result is the same. The plaintiffs are entitled to compensation for construction damages outside the 200 foot wide corridor. One must look to the agreement between the state and the defendant, as contained in the DEP's consistency certification letter, to ascertain the proper measure of construction damages outside the 200 foot corridor. This agreement obligates the defendant to pay to shellfish lessors "full and fair market value."
The next issue is whether the defendant is estopped from litigating the measure of damages by the Robstock v. Iroquois GasTransmission System, Inc. case in Milford. In that case, the defendant apparently argued that market value of oysters is to be measured as they exist upon the ground. Judge Curran stated that "[i]t is at the dock where market value is normally established." The court also stated that "the only evidence of market value that is before the court is $50.00 per bushel . . ." "Collateral estoppel, or issue preclusion, prevents a party from relitigating an issue that has been determined in a prior suit. For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action." (Emphasis in original; citations omitted; internal quotation marks omitted.)Dowling v. Finley Associates, Inc., 49 Conn. App. 330,336, ___ A.2d ___ (1998). There was no evidence in the Milford case about the cost of bringing the shellfish to the dock. In the present case, evidence was introduced as to the cost of bringing the shellfish to the dock, and hence, collateral estoppel is not applicable.
Regarding the proper measure of damages, full or gross market value or wholesale price as urged by the plaintiffs, or value on the ground at the time of damage as claimed by the defendant, or "profit" as found by the committee, the ruling by Judge Curran that market price is established at the dock ties in precisely with 21A Am.Jur.2d, Crops. (1981). "The most widely accepted method of arriving at the value of a growing crop at the time of its destruction, assuming that it had no market value, is: (1) to estimate the probable yield had the crop not been destroyed; (2) calculate the value of that yield in the market; and (3) deduct the value and amount of labor and expense which subsequently to, and but for, the destruction would have been required to mature, care for, and market the crop."
This concept was expanded upon by the Oklahoma Supreme Court in Burke v. Thomas, 313 P.2d 1082, 1089 (1957): "In an CT Page 8649 action for damages for injury to growing crops, the measure of damages is the value of the unmatured crops at the time of the injury. In arriving at such value, it is proper to show by evidence the probable yield under proper cultivation, and the value of such probable yield when matured, gathered, prepared, and ready for sale; also the probable cost of proper cultivation necessary to mature the crop, as well as the cost of gathering, preparation, and transportation to market. The difference between such probable value in the market and the cost of finishing the cultivation, and gathering, preparing and transportation to market, will represent the value at the time of loss."
In the present case, evidence was introduced on all three points in the cited Am.Jur.2d article. The "probable yield" was 1,500 oysters per acre, and 4,800 acres of Tallmadge's oysters outside the 200 foot wide corridor were destroyed. The value of the yield at the dock was not seriously contested and was shown to be $55 per bushel for oysters and $67.50 for clams. The plaintiffs introduced evidence as to the cost to bring the oysters and clams to the dock. This is based on a boat, a captain, and two crewmen, for eleven days, or a total of $71,156.
The committee did mention that the proper measure of damages is price at the dock, less "the cost of getting the shellfish there." But the committee equated that with the loss of "profit." He then came up with a figure of $12.50 for Tallmadge and $8.00 for Sabo for oysters and a lost profit of $4.05 for clams. The Am.Jur.2d article does not refer to "profit" but rather the cost of bringing the product to the dock. Evidence on that exact point was introduced at the trial by the plaintiff. The components were for boats, a captain and crewmen. Profits introduces a new method of calculating damages which is outside the scope of the Am.Jur.2d article setting forth that the "most widely accepted method" is to deduct the "the value and amount of labor and expense . . . to mature, care for, and market the crop."
Moreover, according to both Black's Law Dictionary, 6th Edition (1990), p. 1211 and Ballantine's Law Dictionary, 3rd Edition (1969), p. 1005, profits includes fixed charges, overhead and similar factors. This same definition is found in Bead ChainMfg. Co. v. Saxton Products, 183 Conn. 266, 278, 439 A.2d 314
(1981) ("profit (including reasonable overhead) is the equivalent of net profit plus overhead, or of gross profit including overhead.") CT Page 8650
If the proper method for calculating damages is a factual question, then this court is obliged to accept the committee's method of including overhead and other business expenses to reach profit. Schmaling v. Schmaling, 48 Conn. App. 1, 10,707 A.2d 339 (1998). On the other hand, if such calculation is a legal ruling or conclusion of law, as this court believes, then a different rule applies. "[A] referee's determinations of law in his or her report are not binding on the court. . . . The trial court has the power to render whatever judgment appropriately follows, as a matter of law, from the facts found by the attorney trial referee." (Citations omitted; internal quotation marks omitted.) Dills v. Enfield, 210 Conn. 705, 713, 557 A.2d 517
(1989); see also State Bank of Westchester v. New Dimension Homesof Connecticut, Inc., 38 Conn. App. 491, 497, 661 A.2d 119 (1995) (stating, "[a]ny legal conclusions reached by an attorney trial referee have no conclusive effect").
The plaintiffs' other claim that they are entitled to CUTPA damages is rejected as it axiomatic that such a decision is within the discretion of the fact finder and should not be disturbed. See Tarka v. Filipovic, 45 Conn. App. 46,55,694 A.2d 824, cert denied, 242 Conn. 903, 697 A.2d 363 (1997). In addition, the awarding of common law punitive or exemplary damages to the plaintiff falls within the same rule. The award of damages to the plaintiffs, as recommended by the committee, precludes the award of damages to the defendant on its counterclaim.
Moreover, the defendant cannot escape liability on the ground that it is not responsible for its contractor because the agreement with its contractor permits a work area of 300 feet in width. The dragging of a leveling beam in this expanded area caused damage to shellfish in a wider area than described in the settlement agreement between the plaintiffs and the defendant. Moreover, this claim was not included as a special defense, and also, according to 41 Am.Jur.2d Independent Contractors, § 50 (1995)."[a]n employer may be liable for a trespass committed by the employer's independent contractor where the trespass is committed on the employer's advice and direction or the work necessarily involves a trespass."
In summary, the court accepts the recommendation of the committee that the plaintiffs are not restricted to the award of damages contained in the settlement agreement but rather are entitled to damages for shellfish destroyed by direct CT Page 8651 construction work outside the 200 foot work corridor. The amount of acreage disturbed by the defendant and therefore the amount of damages involves a question of fact. "The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." Lawson v. Whitey's Frame Shop,241 Conn. 678, 690, 697 A.2d 1137 (1997).
This concept involves the claim by Tallmadge, which was rejected by the referee, for destruction of oysters on lots #654 and #687 and of clams on lots #653 and #686. The committee acknowledged receipt of conflicting evidence on this point but chose to credit certain testimony rather than other testimony. "In making this explicit factual determination, the attorney trial referee implicitly found certain witnesses to be credible and believable in their testimony. This was precisely his function as a fact finder. The resolution of conflicting factual claims falls within the province of the trial court." Nor'easterGroup, Inc. v. Colossale Concrete, Inc., 207 Conn. 468, 473,542 A.2d 692 (1988).[15]
The recommendation for the method of calculating damages is rejected in favor of the method referred to in Am.Jur.2d for the reasons previously noted. Therefore, judgment may enter in favor of Tallmadge for $255,722 for its oysters and $2,948,130 for its clams, a total of $3,203,852, and in favor of Sabo for $355,388.[16]
Costs shall be taxed by the office of the chief clerk in accordance with General Statutes § 52-257 and Practice Book (1998 Rev.) § 18-5.
So Ordered.
Dated at Stamford, Connecticut, this 14th day of August, 1998.
William B. Lewis, Judge